James Charles **LAWHORN**, Petitioner,

v.

Michael W. **HALEY**, Commissioner, **Alabama Department of Corrections**, Respondents.

No. CIV.A. CV01C0029E.

United States District Court,
N.D. Alabama,
Eastern Division.

March 22, 2004.

William C. Wood, Norman Wood Kendrick & Turner, Birmingham, AL, Richard L Neumeier, Morrison Mahoney & Miller LLP, Boston, MA, for James Charles Lawhorn, petitioner.

William H. Pryor, Jr., Beth Jackson Hughes, Office of the Attorney General, Montgomery, AL, for Michael Haley, Commissioner, Alabama Dept. of Corrections, Attorney General of State of Alabama, the, respondents.

## MEMORANDUM OPINION

DAVIS, United States Magistrate Judge.

The magistrate judge filed a report and recommendation on February 11, 2004, recommending this petition for writ of habeas corpus filed pursuant 28 U.S.C. § 2254 be granted. Petitioner and respondent filed objections.

The court has carefully reviewed and considered *de novo* all the materials in the court file, including the report and recommendation and the objections thereto. The objections of each party shall be addressed separately, beginning with petitioner's objections.

### *Petitioner's Objections*

#### I. *Rule 32 Order*

Petitioner contends the magistrate judge erred when he recommended the findings made by the Rule 32 trial court in its order denying petitioner relief constituted an "adjudication" within the meaning of 28 U.S.C. § 2254(d), which petitioner contends is defined in Black's Law Dictio-

nary as " .... the process of judicially deciding a case." (Document # 27, at 17–18). Petitioner argues that "the Circuit Court merely signed [an] order [drafted by the state], without adding or deleting a word or comma." *Id.* at 18. Thus, he concludes the Circuit Court did not adjudicate (*e.g.,* engage in the process of judicially deciding) this case. Petitioner cites *Helton v. Secretary for Dept. of Corrections,* 233 F.3d 1322, 1326–27 (11th Cir. 2000), to support this conclusion, in which he argues the state court "correctly concluded that federal law was ignored in state court habeas summary denial decisions which contained, 'no reasoning, analysis, findings of fact, or legal basis for denial of ...claims.' " (Document # 27, at 18) (citing *Helton,* 233 F.3d at 1326–27).

Petitioner's claims are without merit. The Circuit Court in petitioner's case did not summarily deny his Rule 32 petition. The Circuit Court signed a sixty-seven (67) page Order ruling on the issues presented by petitioner in his Rule 32 petition. The content of that Order contains reasoning, analysis, findings of fact and legal analysis. What petitioner is truly complaining about is the trial court's adoption of an order proposed by the state. Such action does not translate into a failure by the trial court to make its own decisions concerning the issues presented in the Rule 32 petition.

## II. *Batson*

Petitioner also presents three reasons why he believes the magistrate judge erred in failing to recommend relief based upon his *Batson* claim. Petitioner contends he has provided prima facie evidence the prosecutor used "its peremptory challenge[s] ... to exclude 8 out of 14 black venire members (57%) but struck only 10 out of 24 white venire members (29%) who were qualified to serve as jurors." *Id.* at 19. However, the magistrate judge discounted this evidence by misconstruing the record on appeal, thus recommending that any prima facie evidence of discrimination was eroded because petitioner also struck black venire-members and because three black venire-members were chosen to serve on the jury.

With regard to the first reason, petitioner contends the facts "before the court on direct appeal were the same as the facts on collateral review and in federal court." *Id.* at 21. Petitioner argues he did not introduce new facts into the record. Instead, counsel contends he is permitted to "analyze [those facts] in any way which a court finds persuasive." *Id.* (citing *Muller v. Oregon,* 208 U.S. 412, 28 S.Ct. 324, 52 L.Ed. 551 (1908)(the Brandeis brief)).

Petitioner declares his analysis of the *Batson* issue in this case shows the magistrate judge should have considered petitioner's proposed method of statistical analysis to be in the nature of a "Brandeis brief." *Id.* Moreover, the magistrate judge should have found "[i]t ... useful to compare" the number of jurors struck in Maxine Walker's (petitioner's co-defendant) trial to those struck in petitioner's trial. In Maxine Walker's case (which involved the same District Attorney who prosecuted petitioner's case), the Court of Criminal Appeals found a prima facie case of discrimination because D.A. Rumsey "struck 11 of the 15 black venire members (73%) as contrasted with 9 of the 36 white venire members (25%)", .... "even though four blacks served on Walker's jury." *Id.* at 24 (citing *Walker v. State,* 586 So.2d 49 (Ala.Cr.App.1991)).

Second, petitioner contends the fact petitioner struck three potential black venire members himself is irrelevant to the question of whether petitioner has established a prima facie case of discrimination. *Bui v. Haley,* 279 F.3d 1327, 1339 n. 17 (11th Cir.2002).

Finally, petitioner contends that the magistrate judge's reliance on *Central Alabama Fair Housing Center v. Lowder Realty Co.*, 236 F.3d 629, 638 (11th Cir.2000)("*Central*"), is misplaced, as that court's assertion "that the unchallenged presence of a particular race on a jury substantially weakens the basis of a prima facie case of discrimination under p[e]remptory striking of jurors of that race[,]" is mere dicta in light of *Cochran v. Herring*, 43 F.3d 1404, 1412 (11th Cir.1995).

### Conclusion

■ Petitioner is correct that even if a defendant also arguably has unclean hands because he too struck members of a particular race from a jury venire, same is irrelevant in the consideration of whether petitioner has made a prima facie case of discrimination. Thus, that portion of the magistrate judge's report and recommendation is due to be rejected.

Petitioner now clarifies he only introduced "the Fisher exact test" and the formulation of the jury in Maxine Walker's case as "Brandeis brief facts," not as evidence in support of nor proof of a prima facie case of discrimination. *Logiodice v. Trustees of Maine, Cent. Institute,* 296 F.3d 22, 30 (1st Cir.2002). He concludes the magistrate judge could have found same to be persuasive or helpful.

This court finds a review of the Fisher exact test to be unnecessary because the magistrate judge recommended the percentage of black jury venire-members struck in petitioner's case should be considered statistically significant. (Report and Recommendation, at 33 (citing *Central*, 236 F.3d at 637)). " '[A] challenge rate nearly twice the likely minority percentage of the venire strongly supports a prima facie case under [*Batson* ].' " (other citation omitted)). Second, the statistical impact of black venire members struck in

Walker's case was far greater than in petitioner's case.

Further, the magistrate judge's reliance on *Central* is not flawed, nor is the material portion of *Central* to which he referred mere dicta in light of *Cochran v. Herring,* 43 F.3d 1404, 1411–12 (11th Cir.1995). In *Cochran,* the Eleventh Circuit quoted *United States v. Allison,* 908 F.2d 1531, 1537 (11th Cir.1990), *cert. denied,* 500 U.S. 904, 111 S.Ct. 1681, 114 L.Ed.2d 77 (1991), writing,

> In *Allison,* the Government used three out of six peremptory challenges to strike black jurors. However, the [*Allison* ] court found that the "unchallenged presence of three blacks on the jury undercuts any inference of impermissible discrimination that might arise simply by the striking of other blacks."

The *Cochran* court went on to state, "although the seating of the jury is a significant fact, it does not bar a finding of racial discrimination. *Allison,* 908 F.2d at 1537." *Id.* at 1412. Petitioner argues *Cochran's* holding means "the presence of some blacks on the jury [are] insufficient to rebut [a] prima facie case." (Document # 27, at 20). Thus, he contends evidence of blacks on the jury can only be rebuttal evidence in response to a prima facie showing of racial discrimination.

However, the *Cochran* court did not find such evidence was only relevant to the state's burden of showing a racially neutral reason for striking jurors after a prima facie case had been established. Further, the United States Supreme Court in *Batson* instructed trial courts to consider all relevant circumstances when deciding whether a defendant has made a prima facie showing of discrimination. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). It wrote,

> A defendant making allegations regarding the improper use of peremptory

strikes against jurors of a suspect class "may make out a prima facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an *inference* of discriminatory purpose .... Once the defendant makes the requisite showing, the burden shifts to the State to explain adequately the racial exclusion." (emphasis added). *Id.* at 94, 106 S.Ct. 1712 (citing *Washington v. Davis,* [426 U.S. 229, 239–242, 96 S.Ct. 2040, 2047–2049, 48 L.Ed.2d 597 (1976)) ]and *Alexander v. Louisiana,* [405 U.S. 625, 632, 92 S.Ct. 1221, 1226, 31 L.Ed.2d 536 (1972) ]. Elsewhere, the Court repeated that it was the defendant's burden to

show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empaneling of the petit jury ... raises the necessary inference of purposeful discrimination. *Batson,* 476 U.S. at 96, 106 S.Ct. 1712.

▮ Thus, it was in the Alabama Supreme Court's discretion to review the entire record, and take into consideration the percentage of black venire persons struck by the prosecutor and seated on the jury when considering whether petitioner made a prima facie case of discrimination. It was also within that Court's discretion to determine, based upon the statistical information and the make up of the jury, that petitioner failed to establish a discriminatory inference created by the prosecution's use of peremptory strikes. Accordingly, the state court's decision was not contrary to federal law nor was it an unreasonable interpretation of the facts in light of the evidence before it.

### III. *Second statement*

Petitioner contends the magistrate judge erred when he recommended peti-

tioner's second confession was not obtained in violation of petitioner's right to counsel pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) or *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981). *Id.* at 26. Petitioner argues his five (5) day isolation and investigator Frankie Wallace's admonishment that petitioner should " 'tell the truth and quit lying,' " was a psychological ploy designed to coerce a confession from petitioner in violation of *Miranda* and *Edwards.* Petitioner cites two cases in support of his contention that he was coerced by prolonged police custody. In *U.S. v. Guido,* 704 F.2d 675 (2d Cir.1983), the Second Circuit found the defendant's Miranda rights had not been violated when, after defendant's arrest and invocation of counsel, he asked what he was arrested for while in the police car on the way to the jail, and was told it was a drug offense, that he should consider cooperating with the police and that he should consider discussing cooperation with his attorney. *Id.* at 675. The defendant also began asking specific questions about the details of the drug offense for which he had been arrested in the booking room of the jail, and when he received a response from the police, exclaimed "Oh Christ. Okay. I knew that one was trouble." *Id.*

The *Matter of Appeal in Maricopa County,* 139 Ariz. 260, 678 P.2d 445 (1984)(en banc), involved a juvenile offender who, after five (5) days in juvenile detention, was taken to a court hearing at which he asserted his right to remain silent and right to counsel, but then confessed to his parole officer when the officer approached the juvenile immediately after the court hearing and told the juvenile that anything he said would be kept confidential.

Neither a suggestion of cooperation nor spontaneous assertion by an adult defendant, much less a confession of a juvenile upon being informed said information would remain confidential, are comparable to the circumstances surrounding petitioner's confession. Petitioner's second confession was not attained in violation of his Fifth or Sixth Amendment right to counsel. In fact, his Sixth Amendment right to counsel had not yet attached because he had not been formally charged at the time he made his confession. *McNeil v. Wisconsin,* 501 U.S. 171, 180, 111 S.Ct. 2204, 2210, 115 L.Ed.2d 158 (1991); and *Patterson v. Illinois,* 487 U.S. 285, 296, 108 S.Ct. 2389, 2397, 101 L.Ed.2d 261 (1988).

## IV. *Heinous, Atrocious, and Cruel*

Petitioner contends the magistrate judge erred when he found the state court's finding that the petitioner's offense was heinous, atrocious and cruel (HAC) to be neither contrary to federal law nor an unreasonable interpretation of the facts presented during state court proceedings. (Document # 27, at 29–30). Specifically, petitioner contends the magistrate judge erred when he "asserted that this court is procedurally barred from considering the fact that the HAC factor was not found in either of the two co-defendants' cases" because petitioner presents this claim for the first time in this petition. *Id.* Petitioner's argument is without merit. The HAC factor was presented in the context of the co-defendants' cases, but only in connection with petitioner's ineffective assistance of counsel claims, not as part of a claim that the HAC factor is unconstitutionally vague on its face or as applied. Further, the Court of Criminal Appeals only addressed these issues as part of petitioner's ineffective assistance of counsel claims.

Petitioner also contends the magistrate judge was mistaken when he found the Alabama Court of Criminal Appeals was correct in making its harmless error conclusion in connection with the faulty HAC jury instruction. *Id.* at 30. He believes the case [1] relied on by the magistrate judge "fail[s] to distinguish controlling Supreme Court decisions that make clear that homicides of this nature cannot, as a matter of federal constitutional law, justify the death penalty." *Id.* at 31 (citing *Godfrey v. Georgia,* 446 U.S. 420, 428–29, 100 S.Ct. 1759, 1765, 64 L.Ed.2d 398 (1980), *Clemons v. Mississippi,* 494 U.S. 738, 740, 110 S.Ct. 1441, 1443–44, 108 L.Ed.2d 725 (1990) and *Maynard v. Cartwright,* 486 U.S. 356, 361–64, 108 S.Ct. 1853, 1857–59, 100 L.Ed.2d 372 (1988)). The aforementioned cases are only material to the extent that they address the potentially unconstitutional overbreadth of a "heinous, atrocious and cruel" jury instruction and the ability of a state appellate court to cure such a deficient HAC instruction if that state has provided adequate constitutional limitations on the application of the factor in that state. *Id.*

Alabama has a limiting construction of the heinous, atrocious and cruel factor. In Alabama, the HAC factor is limited to crimes "of such a nature that [are] 'conscienceless or pitiless' and 'unnecessarily torturous to the victim ....'" *Id.* at 1174–75 (citing *Ex parte Whisenhant,* 555 So.2d 235, 244 (Ala.1989), *cert. denied* 496 U.S. 943, 110 S.Ct. 3230, 110 L.Ed.2d 676 (1990), quoting *Ex parte Kyzer,* 399 So.2d 330, 334 (Ala.1981)). Petitioner believes the Court of Criminal Appeals did not cure the trial court's constitutionally deficient HAC instruction because it did not recognize the proper limiting construction of the

---

**1.** *Hardy v. State,* 804 So.2d 247 (Ala.Cr.App. 1999), *aff'd,* 804 So.2d 298 (Ala.2000), *cert.* *denied,* 534 U.S. 1043, 122 S.Ct. 621, 151 L.Ed.2d 543 (2001).

HAC factor in Alabama. (Document # 27, at 31).

Petitioner has never disputed that his crime was conscienceless or pitiless. Instead, he stresses that for sentencing purposes in Alabama, the "unnecessarily torturous" portion of the HAC factor is analyzed by placing "the emphasis ... on the manner of the killing, not on the defendant's actual participation." *Id.* at 33 (citing *Ex parte Bankhead,* 585 So.2d 112, 125 (Ala.1991)).

Petitioner contends the medical evidence shows the victim's death in this case was instantaneous and therefore cannot be considered unnecessarily torturous to the victim. *Id.* at 32. Petitioner also finds fault with the appellate court's reliance upon *Bush v. State,* 431 So.2d 555, 560–60 (Ala. Cr.App.1982), in finding petitioner's crime to be heinous, atrocious, and cruel because he believes *Bush* is distinguishable from his case. *Id.* at 33. Specifically, petitioner declares the *Bush* court found the defendant's crime to be heinous, atrocious and cruel because the defendant shot a victim in the face to avoid later identification. *Id.* However, he fails to give proper credence to the appellate court's finding that such a shooting took place after the victim already had been shot in the chest, and he does not acknowledge the *Bush* court's assertion that, "Execution-type slayings evincing a cold, calculated design to kill, fall into the category of heinous, atrocious or cruel." *Bush,* 431 So.2d at 560.

Moreover, in *Hubbard v. State,* 500 So.2d 1204, 1227 (Ala.Cr.App.1986), the Alabama Court of Criminal Appeals found the defendant had committed a murder for pecuniary gain, and that the crime was heinous, atrocious and cruel because the victim was alive and possibly conscious for a time after being shot in the mouth, lying on the kitchen floor, when the defendant returned and shot her in the head. *Id.*

■ Regardless of the question of instantaneous death, Alabama law recognizes mental as well as physical torture, and the state court made it clear when it found the HAC factor in petitioner's case, it was because the victim's last minutes of life were filled with terror.[2] Accordingly, the appellate court's harmless error review was not contrary to nor did it involve an unreasonable application of federal law or constitute an unreasonable determination of the facts in light of the evidence presented in state court.

■ Finally, this court rejects petitioner's assertion that the magistrate judge erred when he recommended, as procedurally barred, petitioner's argument that the HAC factor has been unconstitutionally applied by Alabama courts since the 1990s. First, petitioner admits he could have raised these arguments[3] at sentencing, on a motion for new trial, or on direct appeal, but believes he should be excused from this failure because petitioner "did not know until 1999, when the Court of Criminal Appeals expressly ruled in his case that there was no problem finding HAC for one defendant in a death penalty case and non-HAC for another." *Id.* at 34–35. Petitioner's claim is without merit. "In order to show cause for not raising a claim in an earlier petition, a petitioner must show 'some external impediment prevent-

---

**2.** *Hardy v. State,* 804 So.2d 247 (Ala.Cr.App. 1999), *aff'd,* 804 So.2d 298 (Ala.2000), *cert. denied,* 534 U.S. 1043, 122 S.Ct. 621, 151 L.Ed.2d 543 (2001). See also *Bush v. State,* 431 So.2d 555, 560–61 (Ala.Crim.App.1982).; *Knotts v. State,* 686 So.2d 431, 447 (Ala.Cr. App.1995).

**3.** Petitioner also contends that he is "puzzled" because the magistrate judge refused to assume, without petitioner providing any evidence that the heinous, atrocious or cruel factor was presented in co-defendant Mac Lawhorn's action. This court will not assume facts not in evidence.

ing counsel from constructing or raising the claim.'" *High v. Head,* 209 F.3d 1257, 1262 (11th Cir.2000) (quoting *McCleskey v. Zant,* 499 U.S. 467, 497, 111 S.Ct. 1454, 1472, 113 L.Ed.2d 517 (1991)). "Examples of objective factors external to the defense that constitute cause include interference by officials and 'a showing that the factual or legal basis for the claim was not reasonably available to counsel.'" *Id.* at 1263, *quoting Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986).

The factual and legal basis for this claim arose when Lawhorn was convicted and sentenced. It was at that point the inconsistent HAC factor findings became apparent. Petitioner could have compared his case to Maxine Walker's case as persuasive argument to prevent a finding of the heinous, atrocious or cruel factor at his sentencing hearing, in a motion for new trial or on direct appeal. Further, Lawhorn could have presented this claim in his petition for writ of certiorari, and certainly at any level of the state collateral proceedings. Because he has failed to show legal cause for his failure to present this claim prior to the present petition, this court is procedurally barred from considering the merits of same.

## V. *Ineffective Assistance of Counsel claims.*

Petitioner claims the magistrate judge erred when he found that the following ineffective assistance of counsel claim was procedurally barred because it was not raised on collateral appeal: "[F]ailure to investigate or present a cohesive defense theory and focus on relevant issues." (Document # 27, at 38). This claim has been waived by Petitioner failure to specifically present it on collateral appeal.

Nonetheless, a review of the Court of Criminal Appeals' opinion on collateral appeal in *Lawhorn v. State,* 756 So.2d 971,

981 (Ala.Cr.App.1999), shows the appellate court credited the trial court's finding that "'[t]rial counsel did investigate, prepare and present a coherent theory of defense at the guilt stage .. and did focus on relevant defenses,'" when it found that counsel "adequately prepare[d] and adequately present[ed] a defense for Lawhorn at the guilt stage." Thus, it can be reasonably concluded that this issue was addressed on the merits by the appellate court, even if petitioner failed to raise it as a discrete issue.

■ However, the fact that said claim was arguably addressed on the merits does not alter the magistrate judge's recommendation that counsel was not ineffective at the guilt stage. The court agrees with the magistrate judge's recommendation that the evidence supporting petitioner's guilt at that phase of the trial was so strong petitioner could not establish he was prejudiced by counsel's failure to develop a defense theory to a constitutionally significant degree. Further, any factual allegations petitioner would have offered in support of that claim are addressed in various other ineffective assistance of counsel claims discussed by the magistrate judge. Nonetheless, for the sake of clarification, that portion of the magistrate judge's recommendation, recommending that the aforementioned claim be considered procedurally barred, is due to be rejected.

Petitioner finds fault with the magistrate judge's assertion that petitioner could have questioned counsel about their loyalty to him after he discovered one attorney was a brother to a prosecuting attorney, and further that petitioner did not reveal what information he would have divulged to those counsel if he had trusted them. *Id.* at 40. Petitioner complains that such a burden should not have been placed on an individual with a ninth grade

education. The court is unpersuaded by this argument. Moreover, petitioner has never revealed what information he would have given to counsel had he trusted them.

Second, with regard to the issue of involuntary intoxication, petitioner takes issue with the magistrate judge's finding that

> even if the evidence presented at the Rule 32 Hearing had been presented at trial, and the trial court allowed a jury instruction regarding voluntary intoxication, there is no reasonable probability that the jury would have accepted the defense of voluntary intoxication.

*Id.* at 45. Petitioner declares that in making this recommendation, the magistrate judge looked at the evidence in a manner most favorable to the state, when it should have been viewed in a light most favorable to petitioner.

In Alabama, "[t]he degree of intoxication required to show that a defendant was incapable of forming an intent to kill is a degree so extreme as to render it impossible for the defendant to form the intent to kill." *Ex parte Bankhead*, 585 So.2d 112, 121 (Ala.1991). After a review of the factual allegations in support of this claim, and the magistrate judge's legal conclusions regarding same, this court is satisfied the magistrate judge did not view this claim in a light most favorable to the state. (Document # 22, at 88–91). Petitioner has simply failed to show any reasonable probability the jury would have accepted the defense of voluntary intoxication.

■ Next, petitioner complains the magistrate judge erred when he found counsel was not ineffective for failing to seek expert psychological testimony. (Document # 27, at 46). A review of the record, and the recommendation, shows petitioner's argument to be without merit. Other than substance abuse, neither expert at the Rule 32 hearing found that petitioner was suffering from a mental disease or defect. One of the experts surmised that petitioner was borderline mentally retarded, while the other found petitioner to be of low average intelligence. The latter differences were based mainly upon disagreement over petitioner's adaptive skills. Dr. Biedleman did opine that petitioner had a dependent personality, but it was within the trial court's discretion to credit the testimony of Dr. Renfro over Dr. Beidleman concerning petitioner's mental health, particularly when the court had an opportunity to view petitioner himself and found him to be a rather articulate individual for someone with an eighth grade education. As such, the state court's decision was neither contrary to federal law nor was it an unreasonable determination of the facts in light of the evidence before it.

Petitioner next objects to the magistrate judge's recommendation that the state court's determination that mitigation evidence offered at the Rule 32 hearing was essentially the same as that offered at the sentencing hearing, and his recommendation that the state court correctly ruled trial counsel properly investigated petitioner and other witnesses for testimony, were neither contrary to or involved an unreasonable application of federal law.

In support of his objections regarding the cumulative nature of the mitigating evidence offered at sentencing, petitioner contends the following evidence was not presented at trial: an alcoholic father, abusive and alcoholic stepfathers, witness to his stepfather's shooting death at age 6, an underprivileged childhood where he and his siblings were left to watch themselves while their mother worked or kept company with a boyfriend, transient teenage years in which he rebounded from state to state, various family members and school systems, thus becoming a high school drop out at 16, the testimony of his brother Jerry Lawhorn and aunt Datherline Law-

horn, and the fact that he was gainfully employed at the time of the murder. *Id.* at 54–58. Petitioner specifically complains neither Jerry Lawhorn nor Datherline Lawhorn testified in his behalf because they were never asked, when in fact both were aware of the trial dates but did not come to the trial, and Jerry Lawhorn stated he did not come to the trial because he did not want to miss work. The court does not find petitioner's objections to be persuasive. Moreover, this court finds it unnecessary to perform a second analysis concerning each and every allegation heretofore listed, particularly when those allegations are adequately detailed and examined in the magistrate judge's report and recommendation.

The remainder of petitioner's objections consist of complaints that trial counsel failed to investigate and prepare witnesses for trial, including petitioner, petitioner's mother and the victim's wife; failed to adequately examine petitioner when he took the stand in his own behalf at the penalty phase; and failed to object to a pre-sentence investigation report. *Id.* at 59–70. Again, the court does not find petitioner's objections to be persuasive and finds the magistrate judge's analysis of these issues to be more than adequate.

## VI. The Alabama Death Penalty Statute is Unconstitutional

As admitted by petitioner, this claim is procedurally barred.

### Respondent's objections

### I. Riverside

Respondents contend that petitioner's *Riverside* claim is procedurally barred because same was not raised at trial or on appeal. (Document # 29, at 1–15). This issue was raised before the Alabama Supreme Court, reviewed, and found to harbor no reversible error. Therefore, petitioner's *Riverside* claim is not procedurally

barred and should not have been deemed barred by the state court during collateral proceedings. Moreover, this court finds it unnecessary to perform a second analysis concerning this claim, particularly when the allegations and issues objected to are adequately detailed and examined in the magistrate judge's report and recommendation. This court is equally unpersuaded with respondents' argument that the purpose of *Riverside* is to deter unlawful police conduct and that due to the length of time which has elapsed since petitioner's conviction, there would be no deterrent effect by suppressing petitioner's confession as fruit of the poisonous tree.

## II. Improper Prosecutorial Argument

Respondents contend the magistrate judge erred when he recommended the prosecutor's remarks on patriotism be found to be improper. *Id.* at 16–22. First, respondents complain petitioner's claim is a bare assertion unsupported by facts, and declare petitioner failed to cite that portion of the record to which he is referring. Next, respondents argue the prosecutor's argument was not improper.

After considering same, this court finds petitioner adequately stated the claim in his petition. However, it is not convinced the argument was improper. The magistrate judge relied on *Brooks v. Kemp*, 762 F.2d 1383, 1412 (11th Cir.1985), as support for his recommendation that the prosecutor's argument was improper. In *Brooks*, the prosecutor gave a lengthy argument to the jury about the "war on crime," and the general criminal element, while comparing the jurors' role to that of a soldier in battle whose duty it is to kill the enemy.

In *Davis v. Kemp*, 829 F.2d 1522, 1527 (11th Cir.1987), the prosecutor also spoke about patriotism and the duty of soldiers. However, unlike *Brooks*, the prosecutor

did not ask the jury to punish the defendant because he was part of a larger criminal element. Instead, he pointed to the defendant personally and individually when arguing that the underlying circumstances of the particular crime he committed merited the death penalty. Like *Brooks,* the prosecutor in this action made patriotic references. However, he did not inform the jurors that they had a duty to recommend the death sentence as citizen soldiers sworn to ameliorate the criminal element in an ongoing "war on crime."

The court finds the prosecutor's comments to be more closely akin to those of the prosecutor in *Davis v. Kemp.* Rumsey did make patriotic statements and referred to the duty of soldiers, but he also pointed to the circumstances surrounding petitioner's crime and petitioner's intimate involvement in that crime. Rumsey did not place his comments inside a general diatribe on the "war on crime," nor did he strongly infer that the jury must return a recommendation of death against petitioner in order to punish the criminal element of society, thus transforming petitioner into a nameless enemy on whose shoulders the entire responsibility for crime lay. Therefore, Rumsey's remarks did not deprive petitioner of individualized consideration before the jury, and as such, were not improper.

### III. *Clarification regarding petitioner's "R" and "S" claims.*

The magistrate judge recommended the claims purportedly set out in Sections "R" and "S" of the petition for writ of habeas corpus be denied because same were without sufficient detail or clarity to state a constitutional violation pursuant to § 2254(e)(2). (Document #29, at 23). While respondents agree with the magistrate judge's recommendation, they also request that this court also deny the claims because same involve only questions of state law. However, respondents fail to divulge the state law(s) for which they desire affirmation. This court declines respondents' request.

### IV. *Ineffective Assistance of Counsel.*

Respondents contend the magistrate judge should have recommended petitioner's ineffective assistance of counsel claim, the underlying basis being failure to raise and argue the *Riverside* issue on appeal, be denied on the basis that same is procedurally defaulted. *Id.* at 23–24. In his report and recommendation, the magistrate judge wrote,

> The Alabama Court of Criminal Appeals incorrectly concluded that petitioner's claim of ineffective assistance regarding the *Riverside* issue was raised for the first time on collateral appeal. Petitioner specifically identified the *Riverside* violation as an erroneous ruling by the trial court. The statement in paragraph kk, [of the petitioner second amended Rule 32 petition,] also alleges that appellate counsel was ineffective because he failed to brief issues that *were identified* in the preceding sections of the petition. The undersigned magistrate judge believes this was sufficient to put the respondent on notice that this issue was also being raised as an issue of ineffective assistance. However, for the reason set out above, this error is irrelevant to the court's recommendation.

(Document #22, at 18, n. 1).

This court has carefully reviewed those portions of the Rule 32 petition to which the magistrate judge referred and finds petitioner's ineffective assistance of counsel claim is not procedurally barred.

### V. *Ineffective Assistance of Counsel U(1).*

██ Respondents declare the magistrate judge erred when he recommended that trial counsel's failure to investigate

and develop evidence regarding mitigating evidence was not procedurally defaulted. (Document # 29, at 25–26). First, the magistrate judge did recommend the claim, that counsel failed to investigate and develop evidence at the guilt phase, be deemed defaulted. (Document # 22, at 81). Further, while the Alabama Court of Criminal Appeals found that the failure to investigate and develop evidence at the penalty phase was defaulted, at least as far as it applied to counsel's attempt to obtain a psychologist for the benefit of petitioner, it also reviewed the merits of that claim. *Lawhorn v. State,* 756 So.2d 971, 988–89 (Ala.Cr.App.1999). Under the plain statement rule, a federal district court may consider a claim "when a state court's decision created an ambiguity over whether the decision was based on the merits or on the application of a procedural bar." *Morrison v. Thigpen,* 1995 WL 914616, *6 (M.D.Ala. Jan. 19, 1995) (*citing Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)).

Respondents argue the Court of Criminal Appeals did not address the heretofore described claim on the merits, and the magistrate judge took the pertinent portions of the Court of Criminal Appeals' opinion out of context. Thus, they conclude the magistrate judge's recommendation was based upon a false ambiguity.

█ Specifically, respondents contend the Court of Criminal Appeals only addressed petitioner's claim that his trial counsel failed to obtain a psychologist, not a claim that trial counsel failed to have petitioner examined by an expert psychologist. There is no logical reason for arguing that the failure to obtain a psychologist claim is preserved but can only be considered in a vacuum, particularly when the appellate court acknowledged, through testimony of petitioner's attorney as accepted by the trial court, that the purpose of obtaining the psychologist was to examine the petitioner to present mitigating circumstances, that there was nothing in the assessment which could have established a mitigating circumstance, and that petitioner was not prejudiced by counsel's failure. *Lawhorn v. State,* 574 at 988 (citing Rule 32 transcript, at 466–67). Accordingly, respondents' objection is without merit.

## VI. *Ineffective Assistance of Counsel U(2)*

Respondents declare the magistrate judge erred when he recommended petitioner's claim that trial counsel was ineffective because his consultation with petitioner about his right to testify in his own behalf was procedurally barred. (Document # 29, at 26–27). Respondents admit petitioner raised this claim before the Rule 32 trial court but contend petitioner failed to raise his claim on collateral appeal nor argue the claim in his appeal brief.

The magistrate judge acknowledged petitioner did not raise the above claim on collateral appeal, a finding also made by the Court of Criminal Appeals. However, the magistrate also determined the Court of Criminal Appeals addressed the merits of the claim, and therefore recommended that this claim was not procedurally barred. Respondents complain the magistrate judge did not reference the part of the record upon which he made his recommendation. In their opinion, petitioner only argued his attorney was ineffective because he failed to adequately prepare petitioner and other witnesses to testify at the penalty phase of the trial.

The court is persuaded by respondents' objections. The appellate court did not specifically address any failure to adequately consult petitioner about his right to testify at the penalty phase of the trial. To the extent that inadequate consultation was addressed, it was mostly in the con-

text of whether petitioner and his witnesses were prepared in such a manner that more favorable testimony could be elicited about the petitioner's background for the penalty phase of the trial. *Lawhorn v. State,* 756 So.2d at 986. However, within the same analysis the appellate court wrote,

> We too have compared the testimony presented at Lawhorn's trial and the testimony presented at the Rule 32 hearing and find that the evidence presented was essentially the same. While Lawhorn urges us to believe that more graphic details elicited during the penalty phase may have had an influential impact on the jury, this is pure speculation, especially considering the fact that Lawhorn, himself, and his mother during his trial, begged for mercy. Lawhorn has not shown that his counsel's performance was deficient in this regard; nor has he shown that he was prejudiced by his counsel's performance.

*Id.*

■■■ This discussion of damaging details elicited at the penalty phase may have spurned the magistrate judge's recommendation regarding the adequacy of trial counsel's explanation and preparation of petitioner concerning his right to testify, especially the consequences of choosing to testify in his own behalf, and the chance that cross-examination could not only result in unfavorable (as opposed to favorable) testimony, but also destroy the benefits of any favorable testimony about his background. However, it appears to the court that this interpretation is simply too remote from the discrete issue actually addressed by the appellate court. Accordingly, the magistrate judge's recommendation that petitioner's claim of inadequate consultation about his right to testify at the penalty phase of the trial was not procedurally barred is due to be rejected.

## VII. *Ineffective Assistance of Counsel U(11)*

Respondents contend the magistrate judge erred when he recommended that trial counsel's failure to ask the jury to spare his client's life was not procedurally defaulted. (Document #29, at 28–29). Respondents admit the Rule 32 trial court mentioned this failure in its order denying the Rule 32 petition, but they argue it was only addressed within the context of failure to make a closing argument and, in any event, petitioner failed to raise the issue on collateral appeal.

In this habeas petition, petitioner argued that his counsel was ineffective for failing to ask the jury to spare his client's life at the penalty and sentencing phase. Therefore, the magistrate judge addressed the question of procedural default at both stages. The magistrate judge recommended the penalty phase aspect of the claim be found to be procedurally defaulted but did not recommend the sentencing aspect of the claim be found to be procedurally defaulted. (Document #22, at 79).

Further, the magistrate judge did not consider the failure of trial counsel to ask the jury to spare his client's life as a discrete claim in the report and recommendation. This factual allegation was addressed as part of losses petitioner endured as a result of counsel's failure to make a closing argument, which is precisely how the state appellate court considered it, a fact which is readily acknowledged by respondents. *Lawhorn v. State,* 756 So.2d at 987.

## VIII. *Ineffective Assistance of Counsel. U(f)*

Respondents contend petitioner did not raise counsel's failure to call the victim's wife as a witness as a discrete claim in his petition for writ of habeas corpus. (Document #29, at 29–31). A review of the

petition for writ of habeas corpus shows petitioner did raise this claim under the heading, "The petitioner was denied his right to effective assistance of counsel at the penalty and sentencing phases and on appeal." (Document # 1, at 28–29). Underneath that heading, petitioner alleged his trial counsel found the wife's testimony to be unimportant, and he also alleged Roger Appell, a criminal defense expert, expressed in his professional opinion at the Rule 32 hearing, that the failure to call her as a witness was ineffective assistance of counsel. *Id.* Further, respondents entered a denial to these allegations in their answer. (Document # 13, at 66).

█ Respondents now argue said allegations were not a discrete claim proffered by petitioner and request permission to amend their answer to the complaint. (Document # 30). Respondents motion is due to be DENIED. However, the only testimony that has been evoked on this matter is from petitioner's mother and sister. Since the trial court found the testimony of these witnesses to be biased and therefore entitled to less credit, as was within his discretion, petitioner cannot show he was prejudiced by the failure of counsel to present the victim's alleged opinion, and as such, he is not entitled to relief on this claim. Accordingly, the magistrate judge's report and recommendation regarding this claim is due to be rejected.

## IX. *Ineffective Assistance of Counsel U(6)*

The court has reviewed respondents' objections to the magistrate judge's recommendation that counsel's failure to make a closing argument constituted prejudicial ineffective assistance of counsel, and finds same to be unpersuasive. (Document # 29, at 32–38). Moreover, this court finds it unnecessary to perform a second analysis concerning this claim, particularly when those allegations are adequately detailed and examined in the magistrate judge's report and recommendation.

### OPINION

For the foregoing reasons, the magistrate judge's report and recommendation is due to be ADOPTED and his recommendations ACCEPTED, with the exception of the following portions of the recommendation described hereinbelow.

The magistrate judge's report and recommendation is due to be REJECTED to the extent that the magistrate judge recommended that:

(1) petitioner's act of striking black venire members was relevant to the question of whether petitioner made a prima facie discrimination claim, (2) the prosecutor's patriotic argument at closing be deemed improper, (3) petitioner's claim that he was denied ineffective assistance of counsel because of counsel's failure to develop a cohesive defense theory at the guilt stage was procedurally barred, (4) petitioner's claim of inadequate consultation about his right to testify at the penalty phase of the trial was not procedurally barred, and (5) failure to bring forth the testimony of the victim's wife constituted ineffective assistance of counsel.

Accordingly, the petition for writ of habeas corpus filed by petitioner is due to be GRANTED and RELIEF is due petitioner as follows:

1. Petitioner was subjected to an unconstitutional delay in securing a judicial determination of probable cause for his warrantless arrest in violation of the Fourth Amendment to the United States Constitution. The appropriate remedy for this violation is suppression of the confession elicited from petitioner as a result of the delay. Therefore, petitioner's conviction is due to be VACATED.

2. Petitioner's trial counsel was ineffective for failing to make a closing argument in petitioner's behalf at the penalty phase of the trial. Said failure violated petitioner's right to counsel pursuant to the Sixth Amendment of the United States Constitution. The appropriate remedy for this violation is a new penalty hearing. Therefore, petitioner's death sentence is due to be VACATED.

Finally, respondents' motion to amend their answer (Document # 30) to the petition is due to be DENIED.

An appropriate order will be entered.

### ORDER

In accordance with the Memorandum Opinion entered contemporaneously herewith, it is ORDERED, ADJUDGED and DECREED that the petition for writ of habeas corpus filed by petitioner is GRANTED and RELIEF shall be afforded petitioner as follows:

1. Petitioner was subjected to an unconstitutional delay in securing a judicial determination of probable cause for his warrantless arrest in violation of the Fourth Amendment to the United States Constitution. The appropriate remedy for this violation is suppression of the confession elicited from petitioner as a result of the delay. Therefore, petitioner's conviction is VACATED.

2. Petitioner's trial counsel was ineffective for failing to make a closing argument in petitioner's behalf at the penalty phase of the trial. Said failure violated petitioner's right to counsel pursuant to the Sixth Amendment of the United States Constitution. The appropriate remedy for this violation is a new sentencing hearing, which must include a new penalty hearing. Therefore, petitioner's death sentence is VACATED.

Finally, respondent's motion to amend his answer to the petition (Doc. # 30) is DENIED.

DAVIS, United States Magistrate Judge.

### *REPORT AND RECOMMENDATION*

Petitioner, James Charles Lawhorn, ("Lawhorn"), represented by attorney Hank Fannin ("Fannin") and Mark Nelson ("Nelson"), was convicted in Talladega County Circuit Court of capital murder and sentenced, on June 26, 1989, to death by electrocution by the Hon. William C. Sullivan. His conviction and sentence were affirmed on direct appeal. *Lawhorn v. State,* 581 So.2d 1159 (Ala.Cr.App.1990), *aff'd,* 581 So.2d 1179 (Ala.1991). The U.S. Supreme Court denied his petition for a *writ of certiorari* on November 18, 1991. 502 U.S. 970, 112 S.Ct. 445, 116 L.Ed.2d 463 (1991).

Lawhorn filed a petition for relief pursuant to Rule 32, Ala.R.Cr.P., on May 3, 1993. That petition was denied and he appealed to the Alabama Court of Criminal Appeals. That court affirmed the denial of relief. *Lawhorn v. State,* 756 So.2d 971 (Ala.Cr.App.1999). A petition to the U.S. Supreme Court for a *writ of certiorari* was denied on June 9, 2000. *Lawhorn v. Alabama,* 531 U.S. 835, 121 S.Ct. 93, 148 L.Ed.2d 53 (2000). Petitioner filed his pending petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on January 3, 2001.

#### *Factual Background*

The essential facts of this case are recited by the Alabama Court of Criminal Appeals in *Lawhorn v. State,* 581 So.2d at 1161–62 and *Lawhorn v. State,* 756 So.2d at 976–78. The state's evidence reflected that the victim, William Berry, was observed by a police officer on the morning of March 31, 1988, across the street from a gas station in Sylacauga, Alabama where the officer had stopped. Berry appeared to be arguing with two people later deter-

mined to be Lawhorn and Lawhorn's aunt, Altion Maxine Walker.

Later that day, a man driving an automobile belonging to Berry was seen following a truck driven by a woman and later identified as belonging to Walker. The vehicles stopped at a store on Highway 148, about one-half mile from Wiregrass Road. After buying sodas from a drink machine outside the store, both got into the truck and drove away, leaving the automobile parked in front of the store. It remained there until it was towed away by police officers on April 2, 1988.

At approximately 4:00 p.m. on March 31, a man on a dirt road off of Highway 148 observed a truck which resembled Walker's, turn down the road and come toward him. He observed two men and a woman inside the truck. The men were "fairly young men" with beards. (Lawhorn wore a beard at this time).

On April 1, 1988, Walker cashed a check for $800.00 from one account, deposited $600.00 in another account and kept $200.00.

At mid-day on April 2, 1988, a hunter discovered the body of William Berry in a wooded area about 70 feet off Wiregrass Road, approximately 2 miles from Sylacauga. An autopsy revealed abrasions to Berry's forehead and 27 gunshot wounds, 16 of which were entrance wounds and 11 of which were exit wounds. Gunshots from a pistol or rifle caused four of the wounds: one entering the left side of the neck; one entering the chin and traveling to the brain causing death instantly; and two entering the left side of the chest, one of which severed the spine and spinal cord, also causing instantaneous death. The remaining wounds were caused by a shotgun. They were to both arms, the upper abdomen, the right side of the chest, the right leg, and the right upper back. The wounds from either weapon were fatal.

Between April 2nd and 4th, officers seized a 12–gauge shotgun, a 12–gauge .00 buck Winchester shell, and an empty box of .00 buckshot from Walker's residence. A box of Winchester Super–X .25 caliber shells was retrieved from under a shed approximately 50 feet behind the residence. Papers for the operation of a Titan semi-automatic .25 caliber pistol were found between the house and the barn, and a FIE Titan .25 caliber pistol with a clip was recovered in the driveway behind the residence.

A firearms expert determined that three spent 12–gauge shotgun shells found off the road near the scene possessed the same class characteristics as the 12–gauge shotgun recovered from the Walker residence, although he could not conclude with certainty that the spent shells had been fired from that particular gun. However, he did determine that the three .25 caliber spent projectiles recovered from the victim's body and a spent .25 caliber cartridge found at the scene had been fired by the pistol found in Walker's driveway. Shotgun pellets retrieved from the body and in and around the crime scene were determined to be .00 buckshot.

A fingerprint lifted from the exterior door of Walker's truck belonged to Lawhorn. A fingerprint lifted from the box of Winchester shells found under Walker's shed belonged to Walker.

Lawhorn was arrested without a warrant on April 2, 1988. Petitioner was advised of his rights guaranteed by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) by Investigator Frankie Wallis at the Sylacauga police department. Lawhorn acknowledged that he understood his rights, stated that he wished to talk, and signed a waiver form. He made no inculpatory statements on that date. However, after some questioning

occurred, petitioner asserted his right to counsel and questioning ceased.

Petitioner was then held in custody at the Talladega County jail for six days before the police sought a judicial determination of probable cause and obtained an arrest warrant for Lawhorn on April 8, 1988. During this time period he never consulted an attorney.

On April 7, 1988, Officer Wallis was walking past petitioner's cell when Lawhorn stated that he wanted to talk to Wallis. Wallis testified that he told petitioner that he could not talk to Lawhorn because of his request for counsel. According to Wallis, Lawhorn said he would waive this right. However, Wallis could not immediately stop and talk to petitioner because of another matter. About 30 minutes later, at approximately 4:00 p.m., Wallis returned and, in the presence of Ann Wallace of the district attorney's office and Lt. Billy Pope, petitioner was again advised of his rights. Petitioner again acknowledged his understanding of his rights and his desire to talk with the officers. Petitioner also executed a waiver form stating, "I do not want a lawyer."

No one made any threats or any promise or reward to make a statement. He stated that his aunt, Walker, had tried to hire him to kill Berry, but that he did not take any part in it and that he was in Alexander City until 5:00 p.m. on the day of the murder.

Thereafter, petitioner was told that they believed he was lying and that he should tell the truth. Lawhorn testified that he was told by Wallis that things would be better for him if he told the truth. Wallis denied making any such statement. Nevertheless, at approximately 5:40 p.m. Lawhorn gave another statement.

Petitioner stated that from the Monday before the murder to the Friday after, he stayed with his aunt, Walker. During the week, Walker told him that she was scared of Berry; that she had asked her son, Kilgore, to "beat his ass", and that she wanted to "get rid" of him. Nearly every day, she asked Lawhorn to get rid of Berry. On Wednesday, she told him she would pay him and he said, "No." On Thursday, petitioner and Walker, in Walker's truck, ran some errands in Alexander City. They picked up petitioner's brother, Mac Lawhorn. On their way back to Sylacauga, Walker asked Mac if he would be interested in making some money, and he said, "Yes." He asked what the job was and she told him she wanted him to "get rid of William." She was willing to pay Mac Lawhorn and the petitioner $100.00 for their services.

In Sylacauga, they went to the Otasco hardware store where petitioner retrieved a 12–gauge single-shot shotgun and four shells from the automobile of his cousin Kilgore, Walker's son. Then, between 4:00 p.m. and 5:00 p.m., the three went to a wooded area, where, according to Walker, she and the victim "go parking." The petitioner and Mac Lawhorn got out of the truck to wait in the woods until Walker returned with Berry. Petitioner had a pistol in his pocket that he had retrieved from Walker's truck, and Mac Lawhorn was carrying the shotgun, which he loaded.

In less than 30 minutes, Walker returned with Berry. Petitioner and Mac Lawhorn were hiding in the woods. Berry and Walker got out of Walker's truck, and according to Walker's version that she later told petitioner and his brother, Walker went across the road to the bushes to "use the bathroom." Berry went across the road with her, but he then began running up the road. Walker went to the two men and told them that Berry was running up the road. Then, Walker got into the driver's seat of her truck, the two men lay down in the bed of the truck, and Walker

told them that she would slam on the brakes when she caught up with Berry.

According to Lawhorn's statement, when Walker slammed on her brakes, Mac Lawhorn raised up and shot Berry in the shoulder. Berry fell to the ground, yelled, got up, and started running again. Mac Lawhorn then shot him again. Initially, Berry kept running toward the woods, but then fell to the ground. Mac Lawhorn told petitioner to make sure Berry was dead. Petitioner stated that he then walked over to the victim who was making gurgling noises. He saw that Berry fell because his feet had become tangled on a vine. He then pulled out his pistol and shot him approximately three times. They then drove away from the area.

After Walker's son, Kilgore, got off work at 5:30 p.m., he and petitioner went back to the murder scene to look for the shotgun and pistol shells because petitioner did not want to leave any evidence. He could not find any so the two drove to Walker's house. There, Kilgore told his mother to clean the shotgun. He also told her to get the pistol because she had a permit to carry it, and that "would show instant guilt." However, Walker had already given the pistol to Mac Lawhorn for disposal. As a result, petitioner called his brother around 6:30 p.m. and told him to get the pistol. Telephone records verify that a telephone call was made at 6:40 p.m. on March 31 from Walker's residence to petitioner's mother's residence. Mac Lawhorn told him that he, their mother, and their sister were going to eat and that they would be back later. Walker and petitioner went to the Lawhorns' mother's house to get the pistol from Mac Lawhorn. While Walker sat in her truck, petitioner got the pistol. Mac Lawhorn told Walker to bring him his money the following morning, and Walker replied, "I'll go to the bank in the morning and get the money." Petitioner and Walker then left and

returned to her house between 7:30 p.m. and 8:00 p.m. At that location, Kilgore took the pistol, put it in the trunk of his automobile, and said that he would do something with it.

On Friday morning, Walker and petitioner left Walker's residence and "went straight to the bank" where Walker gave him $50.00 and told him it was payment for "getting rid" of Berry.

### Procedural Background

In addition to the conviction and death sentence received by petitioner, Maxine Walker was convicted and sentenced to death, although the sentencing judge in her case, the Hon. Jerry Fielding, did not find that the crime was "especially heinous, atrocious or cruel." However, Walker's conviction was overturned on appeal for a *Batson* violation and the case has not yet been retried. Walker was the first of the three defendants to be tried.

Petitioner was tried next. The trial lasted a day and a half. Fannin's fee declaration reflects that, prior to trial, he spent a total of 14.5 hours in out-of-court preparation time. Of these, eight hours were spent on October 10, 1988, reviewing the death scene and investigation as to which county the crime occurred. The time spent determining which county the crime occurred in turned out to be wasted time. Although the crime occurred close to the Clay County/Talladega County line, under Alabama law a county may prosecute crimes that occur within one mile of its borders.

The remaining six and one-half hours were spent in three meetings with Lawhorn, once in June 1988, once in July 1988, and once in August 1988, and preparing a motion for psychiatrist and an order appointing an investigator. Fannin filed this motion but never pursued it.

Steve Giddens, who was appointed co-counsel with Fannin on May 10, 1988, withdrew on April 3, 1989, when he accepted a job at Legal Services Corporation. Mark Nelson was then appointed to represent Lawhorn as co-counsel to Fannin. Nelson opened his file on April 17, 1988, only one week before trial commenced.

The main evidence against petitioner was his confession. At the penalty phase, petitioner's trial (and appellate) counsel, Hank Fannin ("Fannin"), called several witnesses on behalf of petitioner and petitioner also took the stand. However, after the prosecutor made the first part of his opening statement, Fannin waived closing argument based on an erroneous understanding of Alabama law. Fannin believed that if he waived his closing argument, the prosecution could not argue any further in rebuttal. This was incorrect. As a result, the prosecutor made two closing statements at the penalty phase and counsel for petitioner made none.

In addition, at sentencing, petitioner and his counsel were presented with a presentence report. Petitioner claims that his trial counsel failed to object to a gratuitous recommendation of death contained in the report, gross factual errors, layers of unconfronted hearsay, and an interview conducted of petitioner without benefit of counsel. He also failed to present any testimony about his upbringing, abuse received as a child, education and other events in his life which petitioner believes would have resulted in a sentence of life without parole.

Likewise, although out of jurors who were called to deliberate in this case, the state struck 57% of the black venire members but only 26% of the white venire members, Fannin did not make a *Batson* argument on direct appeal.

The last defendant tried was Mac Lawhorn ("Mac"). Mac's counsel, unlike Fannin, did make a closing argument at the sentencing phase and the jury recommended a sentence of life without parole. In this case, also tried before Judge Sullivan, the court did not find the killing to be "especially heinous, atrocious or cruel."

At the Rule 32 hearing, petitioner presented the testimony that before trial, Hank Fannin was visited by Lawhorn's sister and mother, Shirley Hudson. Hudson told Fannin that she was approached by the wife of the deceased, who expressed to Hudson that she was very sorry that petitioner and Mac Lawhorn had gotten involved in her husband's murder. Further, the wife of the deceased was convinced that Maxine Walker was responsible for her husband's death. Hudson testified that Fannin told her that this information was not important.

Attorney Roger Appell, an expert witness, opined that trial counsel's failure to bring forth the widow's belief that Walker was the principal culprit either at the guilt, penalty or sentencing phase constituted ineffective assistance of counsel.

Jerry Lawhorn, petitioner's brother, testified about petitioner's upbringing, including the fact that petitioner suffered through several hard-drinking, abusive step-fathers. He also witnessed the shooting death of one of his step-fathers when he was only six years old. Likewise, he testified that he and petitioner were often left in the care of their sister, Debra, when their mother would go off to visit with a boyfriend for days at a time.

Although Fannin offered no evidence as to what happened to petitioner after his 1979–80 academic year, in fact, petitioner moved to Texas to live with his father and enrolled in middle school in Grand Prairie, Texas in April 1980. Soon, petitioner's father divorced and he and petitioner moved to Allen, Texas. Shortly thereafter, petitioner's father was jailed for DUI and petitioner went to live with O.B. and

Sandra McClure, where he stayed approximately six months to a year.

In the fall of 1981, when he was supposed to enter the ninth grade, petitioner did not attend because his father was in jail and the people with whom he was residing did not send him to school. After his father got out of jail, petitioner went to school in Allen for six weeks. During this time, petitioner was given an aptitude test which revealed that he had not mastered basic skills such as math, reading, and writing.

In the Spring of 1981, petitioner went to live with an aunt and uncle in Lagrange, Georgia because his father was a chronic alcoholic who could not hold down a job. During this time, he did not attend school at all. He next returned to the home of his mother and step-father In Alexander City, Alabama, where he attended school from late August 1981 to November 30, 1981. He then returned to Lagrange, Georgia. However, he did not attend school again until he enrolled at Valley High School in Alabama on December 4, 1981, staying only until January 12, 1982.

On January 12, 1982, petitioner went to live with his father and started attending Troup County High School in Lagrange, Georgia. On April 6, 1982, petitioner left Troup County High School at age 16 and never returned. He never completed the ninth grade.

Petitioner also presented expert testimony from Mr. Appell that Fannin's failure to make a closing argument at the sentencing phase of the trial was his most egregious mistake. However, he also faulted Fannin for his failure to press for funds for psychiatric testimony and stated that, in his opinion, Fannin's failure to present evidence of petitioner's drug use was ineffective assistance of counsel because, had it been raised, petitioner would have been entitled to a jury charge on the issue of voluntary intoxication. In addition, he found fault with Fannin's failure to present evidence that the widow of the victim did not wish petitioner to be put to death, with his failure to rebut unfavorable statements contained in the pre-sentence record, and with his failure to ask anyone at any time to spare his client's life. Finally, Appell asserted that Fannin's direct examination of petitioner was deficient in that it consisted of only three questions.

### Discussion

### A. and B. Riverside issue

Petitioner asserts that the court should order a new trial for him because (*A*) he was subjected to an unconstitutional delay in securing a judicial determination of probable cause for his arrest in violation of *County of Riverside v. McLaughlin,* 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991), and, (*B*) that his arrest on April 2, 1988 was unlawful as lacking in probable cause such that his alleged confession made on April 7, 1988, after five days of virtual isolation, was fruit of his illegal arrest and should not have been introduced.

Respondent argues that this court is barred from hearing these claims based on *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). That case held that:

> [W]here the state has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas relief on the ground that the evidence obtained in an unconstitutional search or seizure was introduced at his trial.

*Stone* at 494, 96 S.Ct. 3037. According to respondent, there is no evidence that petitioner challenged the legality of his arrest at his trial and no evidence that he was prevented from raising this claim at trial. However, it is also asserted that the record reflects Lawhorn did challenge the voluntariness of his confession at trial.

Since petitioner litigated or had the opportunity to litigate these claims in state court, respondent contends that the court should apply the rule of *Stone v. Powell* and refuse to consider the merits of these claims.

Respondent implicitly concedes that petitioner did raise the issue concerning the legality of his arrest in his direct appeal to the Alabama Supreme Court. While not expressly addressing this issue, the Supreme Court stated the following:

> Lawhorn has raised here 13 additional issues that were not presented to the Court of Criminal Appeals. The State contends that we should not consider these issues because they were raised for the first time in this Court. Because we have the power to consider any issue in a capital case concerning the propriety of the conviction and death sentence and, more importantly, because a man's life hangs in the balance, we have fully considered each of those 13 additional issues raised by Lawhorn. In addition, we have independently searched the record for error. After careful consideration of the applicable law and after our exhaustive search of the record for error, we can find no reversible error in the proceedings below.

*Ex parte Lawhorn*, 581 So.2d at 1180–81. Respondent asserts that, in addition to the bar raised by *Stone v. Powell*, since these claims were raised on direct appeal to the Alabama Supreme Court and were denied by that court, 28 U.S.C. § 2254(d) provides that habeas relief cannot be granted on claims that were adjudicated on the merits in State court proceedings. The exceptions to this rule include situations where the denial of relief for these claims in state court "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreason-

able determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d). As noted above, *Stone v. Powell* is only applicable where there has been an opportunity for a *full and fair litigation* of a Fourth Amendment claim.

■■■ When Lawhorn was arrested on April 2, 1988, Alabama law required that he be arraigned within 72 hours. Ala. R.Crim.P. 4.3 (1989). However, Lawhorn was detained for six days before an arrest warrant was obtained. *Riverside* held that a delay in securing a judicial determination of probable cause exceeding 48 hours presumptively violates the Fourth Amendment.

*Riverside* is "a new rule for the conduct of criminal prosecutions[, and] is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final." *Powell v. Nevada*, 511 U.S. 79, 84, 114 S.Ct. 1280, 1283, 128 L.Ed.2d 1 (1994); *Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987). Lawhorn's case was "not yet final" when the *Riverside* opinion was issued on May 13, 1991. His conviction was not final until the U.S. Supreme Court denied certiorari in October 1991.

The essence of a *Riverside* claim was raised on direct appeal to the Alabama Supreme Court [R. 30, Brief in Support of Petition for Writ of Certiorari to the Alabama Court of Criminal Appeals at 53–54], and rather than finding it procedurally defaulted, the Alabama Supreme Court denied the claim on its merits. *Ex parte Lawhorn*, 581 So.2d at 1180–81. As noted above, where a claim is adjudicated on its merits in state court, a writ of habeas corpus can not be granted with respect to such claim unless, *inter alia*, it resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

The U.S. Supreme Court has concluded that a state court decision is "contrary to" clearly established Supreme Court precedent when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or ... the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Petitioner asserts that the decision of the Alabama Supreme Court, on direct appeal, and the decision of the Alabama Court of Criminal Appeals, in the appeal from the denial of his Rule 32 petition, regarding this claim is contrary to the U.S. Supreme Court's decision in *Riverside*.

Both the discrete and ineffective assistance *Riverside* issues were set forth in petitioner's Rule 32 petition. [R. 37, Petitioner's Second Amended Petition]. It states:

A. *The defendant was subjected to unconstitutional delay in securing a judicial determination of probable cause for his warrantless arrest.*

7. The defendant was arrested on April 2, 1988, and was thereafter detained for five days before a probable cause hearing was held and an arrest warrant was obtained.

8. As a result, the defendant was denied his Fourth Amendment right under the United States Constitution to a prompt, fair, and reliable determination of probable cause within 48 hours of his arrest as a condition for pre-trial restraint of liberty. *Baker v. McCollan,*

443 U.S. 137, 142–43, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); *Riverside v. McLaughlin,* 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991); *Waldrop v. State,* 523 So.2d 475, 490 (1987). *See* Ala.Crim.P.R. 4.3.

B. *The petitioner's unlawful arrest violated his rights under Alabama Law and the Fourth, Eighth and Fourteenth Amendments of the United States Constitution, and, therefore, confessions obtained as a result of that arrest should have been suppressed.*

*Id.* at 3.

p) [Trial] Counsel failed to lay a proper foundation by which the judge could rule that the second confession made by the defendant was not voluntary.

*Id.* at 35.

kk) [Appellate] Counsel failed to provide effective assistance of counsel on appeal to the Alabama Court of Appeals. They failed to brief numerous meritorious issues on appeal, including but not limited to various issues identified elsewhere in this petition.

*Id.* at 38.

With regard to the ineffective assistance claim as it relates to the *Riverside* issue, the court finds that the record clearly reflects that, though not citing *Riverside* by name, the *Riverside* claim was raised at both trial and on direct appeal and was specifically addressed by the Alabama Supreme Court when it found all otherwise unaddressed issues raised by petitioner to be without merit.[1]

---

1. The Alabama Court of Criminal Appeals incorrectly concluded that petitioner's claim of ineffective assistance regarding the *Riverside* issue was raised for the first time on collateral appeal. Petitioner specifically identified the *Riverside* violation as an erroneous ruling by the trial court. The statement in paragraph kk, *supra,* also alleges that appellate counsel was ineffective because he failed to brief issues that *were identified* in the preceding sections of the petition. The undersigned magistrate judge believes this was sufficient to put the respondent on notice that this issue was also being raised as an issue of ineffective assistance. However, for the reason set out above, this error is irrelevant to the court's recommendation.

There can be no finding of ineffective assistance for failure to raise an issue at trial or on appeal when the record reflects that the issue was, in fact, raised. Therefore, petitioner's claim that trial counsel was ineffective for failing to raise the *Riverside* claim and seek the suppression of the resulting confession is without merit.

With regard to the discrete *Riverside* claim and the related confession, the Rule 32 court held that petitioner's claims (A) that the State failed to secure a determination of probable cause for the warrantless arrest and (B) that his statements obtained as a result of this arrest should have been suppressed, were barred from review, at least in part, because they were raised on appeal. [Tab 42, Order Denying Rule 32 Relief at 5]. On appeal, the Alabama Court of Criminal Appeals stated that Lawhorn's claim that the trial court erred in its admission of allegedly illegally obtained statements made by him on April 7, 1988, was procedurally barred pursuant to Ala.R.Crim.P. 32.2(a)(2) and (4), because it was raised and addressed at trial and/or on appeal. *Lawhorn v. State*, 756 So.2d at 994. The court also stated that Lawhorn's claim that his arrest was unlawful under Alabama law and the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution, and therefore, the confession obtained as a result of that arrest should have been suppressed is pro-cedurally barred . pursuant to Rules 32.2(a)(3) and (4) because it could have been but was not raised at trial, and was addressed on appeal. *Id.* at 996.

 Even though *Riverside* was made retroactive to cases not yet final on direct appeal, the decision was not delivered until 3 days after the ruling of the Alabama Supreme Court denying petitioner's direct appeal. Therefore, it cannot be said that this issue was **"clearly** established" at the time of this decision.[2] However, because the rule in *Riverside* is retroactive to cases that were not final at the time the decision was rendered, the trial court's decision *is* contrary to the law of the United States Supreme Court.[3] Since *Riverside* was decided *after* the Alabama Supreme Court denied petitioner's direct appeal, but before the appeal was final, it is applicable to Lawhorn's case. Furthermore, this rule was "clearly established" law by the time petitioner raised the issue in his Rule 32 petition and the Alabama Court of Criminal Appeals was obligated to revisit the issue because the change in law was retroactive in petitioner's case.

 Nevertheless, it failed to do so. *Anderson v. Calderon*, 232 F.3d 1053, 1069–70 (9th Cir.2000). A four day delay in validating a defendant's arrest before a magistrate is presumptively unreasonable, violating the Fourth Amendment to the U.S. Constitution. *Powell v. Nevada*, 511 U.S. at 83–84, 114 S.Ct. at 1283.[4]

---

2. Though not discussed in detail, the claim that the Alabama Supreme Court's decision was based on an unreasonable determination of the facts in light of the evidence presented at the State court proceeding, is without merit.

3. Petitioner's application for a writ of certiorari to the United States Supreme Court was not denied until November 1990. Thus, his conviction and direct appeal were not yet final at the time of the *Riverside* decision.

4. Respondents assert that review of this claim is barred by *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). In that case, the Supreme Court said, in essence, that it is improper to second-guess a trial judge's finding that the facts are sufficient to provide probable cause to legitimize a search. Here, the court is not being asked to second guess the factual findings of the State courts, but, rather, to determine if they have made a mistake regarding the application of clearly established federal law as set forth by the U.S. Supreme Court. Therefore, the rule of *Stone v. Powell* is inapplicable. In any event, it is clear that petitioner did not have the opportunity for a full and fair litigation of the *Riverside* issue at trial because the case did not

However, there is much confusion over the appropriate remedy for a *Riverside* violation. The Supreme Court has specifically declined to address this issue. *Powell v. Nevada,* 511 U.S. at 85, 114 S.Ct. 1280. Although suppression of evidence has been a preferred remedy for a Fourth Amendment violation, *see Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), it is not the automatic remedy for any such violation. *See Arizona v. Evans,* 514 U.S. 1, 10, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995).

 While determining the appropriate remedy for this violation, it is important to recall that the very purpose of the exclusionary rule is based on the need and the ability to guide police conduct. *See United States v. Leon,* 468 U.S. 897, 916, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (exclusionary rule not applicable because police error not intentional). The Ninth Circuit Court of Appeals has concluded that the appropriate remedy for a *Riverside* violation is the exclusion of the evidence in question *if* it was "fruit of the poisonous tree." *Anderson v. Calderon,* 232 F.3d at 1071. That court observed that such an approach ensures that courts will not suppress evidence causally unrelated to the Fourth Amendment violation. At the same time, it protects the arraignment right in question by barring any exploitation of the delay that causally produces a statement. *Id.* The undersigned magistrate judge has been unable to locate any Eleventh Circuit case law on this point, but the approach of the Ninth Circuit is both reasonable and comports with the holdings of the U.S. Supreme Court regarding the suppression of evidence. *See Brown v. Illinois, supra.*

The undersigned magistrate judge finds a record of uncontradicted evidence showing that Lawhorn was given his *Miranda* rights on the day he was arrested, that he subsequently invoked his right to counsel, and thereafter, it was he who re-initiated contact with the police. He was once again given his *Miranda* warnings before he provided the inculpatory confession. The Court concludes that the confession was voluntary for Fifth Amendment purposes. In any case, the trial court's ruling that the statement was admissible for Fifth Amendment purposes *is* protected from review by *Stone v. Powell, supra.*

However, the Supreme Court noted in *Brown* that "[i]n order for the causal chain, between the illegal arrest and the statements to be broken, *Wong Sun* [*v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)] requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be sufficiently an act of free will to purge the primary taint. *Wong Sun* thus mandates consideration of a statement's admissibility in light of the distinct policies and interests of the Fourth Amendment." *Brown,* 422 U.S. at 601–02, 95 S.Ct. 2254, 45 L.Ed.2d 416 (internal citations and quotation marks omitted).

 The government has the burden of showing a sufficient break in events to undermine the inference that the confession was caused by the Fourth Amendment violation. *Oregon v. Elstad,* 470 U.S. 298, 306, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). In *Brown,* the Supreme Court set forth the following factors for courts to consider in determining the existence of a sufficient break: (1) the presence or absence of *Miranda* warnings; (2) the temporal proximity of the arrest and the confession; (3) the presence of intervening circumstances; and (4) the purpose and

exist until three days after petitioner's appeal to the Alabama Supreme Court was denied, and the issue was never appropriately addressed in the Rule 32 appeal because the Alabama Court of Criminal Appeals incorrectly found the issue to be procedurally barred.

flagrancy of the official misconduct. *Brown,* 422 U.S. at 603–04, 95 S.Ct. 2254. The voluntariness of the confession is a threshold requirement in a "fruit of the poisonous tree" analysis. *Id.* at 604, 95 S.Ct. 2254. As to the four *Brown* factors, the court's analysis is as follows:

First, the record of petitioner's trial reflects that petitioner was advised of his *Miranda* rights on the day of his arrest, April 2, 1988. The statement given was not inculpatory. Upon further questioning by police, petitioner asserted his right to terminate further discussion in the absence of counsel and questioning ceased. Petitioner was held in custody without access to an attorney for five days. After five days of isolation, he re-initiated contact with police. He was re-advised of his rights on the afternoon of April 7, 1988, and gave another exculpatory statement. Approximately two hours later he was again questioned by police. He was not re-advised of his *Miranda* rights though reference was made to the advice of rights that he had received earlier in the day. He then confessed. The fact that petitioner was given his *Miranda* warnings on two occasions weighs somewhat in the respondents' favor. The length of Lawhorn's detention and his isolation do not.

■ *Brown's* "temporal proximity" factor weighs heavily in Lawhorn's favor. The inculpatory confession occurred only after he had given two exculpatory statements and after he had been in custody for five days without access to counsel. Further, this extended period of confinement without a determination of probable cause violated not only *Riverside* but also the Alabama statute in effect at that time which required arraignments to occur within 72 hours. A review of a 1988 calender reflects that April 2, 1988, was a Saturday. However, intervening weekends do not serve to justify a delay in obtaining an independent determination of probable cause by a magistrate. *Riverside,* 500 U.S. at 57, 111 S.Ct. at 1670. In any event, even if the weekend is excluded, no determination of probable cause was made until the following Thursday, April 8, 1988. Thus, there still exists a *Riverside* violation and a violation of the Alabama statute.

Third, there were no significant intervening circumstances between the time of Lawhorn's arrest and his confession five days later. The record does not reflect that he met or spoke with any attorney, friends or family members during this time. There is no evidence of anything that might have caused Lawhorn to finally confess, other than his extended incarceration. The burden is on the respondent to demonstrate intervening circumstances, *Riverside, id.,* and they have failed to do so.

Fourth, there is evidence that the continued detention of Lawhorn was accomplished for an improper purpose. "Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake." *Riverside,* 500 U.S. at 56–57, 111 S.Ct. at 1670.

Respondent argues that the confession should not be suppressed because, even assuming a *Riverside* violation, probable cause to arrest Lawhorn existed on April 2, 1988, when his co-conspirator, Maxine Walker, confessed and implicated Lawhorn. While this information may have been sufficient to provide probable cause to arrest petitioner, it certainly was not enough to convict him unless Walker agreed to testify against him, which she did not do. Otherwise, her statement is inadmissible against Lawhorn at trial and the investigators had no evidence against Lawhorn unless he confessed. *Cf. United States v. Costa,* 31 F.3d 1073, 1076 (11th Cir.1994) (*Bruton* violation occurs when

government seeks to introduce custodial confession of non-testifying co-defendant that incriminated co-defendant and defendant, because limiting instruction was ineffective to prevent violation of defendant's rights of confrontation and cross-examination). By denying petitioner a prompt arraignment, law enforcement officers avoided the possibility that petitioner would be appointed counsel who would advise him not to make any further statements.

The implication gathered from the testimony submitted is that the police investigating this crime knew there was not enough evidence to convict Lawhorn and sought to keep him in jail while they gathered more evidence. This, in fact, is what the testimony shows they did. After Walker's statement on April 2, 1988, investigators, over the next several days, gathered physical evidence from the crime scene, obtained lifts of fingerprints from a motor vehicle used in the commission of the offense, took fingerprints of the subjects, delivered the prints and the lifts to an expert for comparison, and, with the cooperation of one of Walters' family members, recovered the firearms used in the murder from locations where they had been hidden or discarded. It is important to note that although respondent asserts the police possessed probable cause to arrest Lawhorn on April 2, 1988, they did not obtain a judicial determination of probable cause until April 8, 1988, the day after petitioner confessed.

Thus, it appears that the only evidence of intervening events which would tend to serve as a break between petitioner's extended incarceration and the inculpatory statement was the giving of the *Miranda* warnings. However, *Miranda* warnings alone and per se, cannot always make the act sufficiently a product of free will. *Brown*, 422 U.S. at 603, 95 S.Ct. at 2261. Under these circumstances, the court finds that the respondent has failed to sustain

the burden of showing that the evidence in question is admissible under *Wong Sun*.

Therefore, the appropriate remedy for the violation of petitioner's Fourth Amendment right in this instance is the suppression of this statement.

### C. Pro-death penalty bias

Lawhorn contends that the trial court's failure to propound questions to the jury venire concerning any pro-death penalty bias resulted in his unconstitutional conviction and death sentence. (Document # 1, at 12) (*citing Adams v. Texas*, 448 U.S. 38, [100 S.Ct. 2521, 65 L.Ed.2d 581 (1980))].

Respondents assert that the merits of this issue were correctly addressed on direct appeal by the Alabama Court of Criminal Appeals. (Document # 16, at 16). The Court of Criminal Appeals reviewed the record and found that no reversible constitutional error occurred for two reasons. First, defense counsel did not request the trial court examine the venire on the issue nor did he propound any questions to the jury himself even though he had ample opportunity to do so. *Lawhorn v. State*, 581 So.2d at 1165. In fact, the prosecuting attorney actually asked one panel of the venire whether they would automatically impose the death penalty if the defendant was found guilty, and received no affirmative reply. *Id.* Second, "immediately after the trial court asked the venirepersons if anyone had a fixed opinion against capital punishment, it asked if anyone had a fixed opinion against 'penitentiary punishment,' and no one responded." *Id.* at 1166. Thus, the state court concluded that the jury selected was not constitutionally infirm.

After careful consideration, it is apparent that Lawhorn's reliance upon *Adams v. Texas* to support his claim of trial error is faulty. While *Adams* and its progeny decree that a member of the jury venire may be examined by or at the re-

quest of counsel, and challenged for cause if he harbors such a fixed opinion regarding the death penalty that "those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath," they do not mandate that the trial court conduct its own death bias *voir dire* of the jury venire *sua sponte*.[5] Therefore, Lawhorn's petition for writ of habeas corpus is due to be denied as to this issue because there is no evidence that the state court's decision concerning this claim was contrary to or involved an unreasonable application of federal law, or was based upon an unreasonable determination of the evidence presented in the state court proceedings.

### D. Failure to change venue due to pretrial publicity

Lawhorn contends that the trial court "improperly overruled" his request for a change of venue, thereby violating his right to a fair trial as guaranteed by the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because "the murder of the victim was highly publicized in the newspapers and on the radio[, and] .... various venire members indicated a familiarity or awareness of the case via the media." (Document # 1, at 13).

Respondents reply that the Alabama Court of Criminal Appeals addressed the merits of this issue on direct appeal and correctly found that the amount of publicity that Lawhorn's case received did not

result in any prejudice to him at trial. (Document # 16, at 21–24). Lawhorn does not dispute the state court's findings of fact with regard to the evidence surrounding this issue.[6]

After careful review of the record, the positions presented by both parties, and applicable federal law, it is recommended that Lawhorn's request for writ of habeas corpus be denied as it relates to any media saturation in Talladega County. There is no evidence that the state court's refusal to change venue was contrary to or involved an unreasonable application of applicable federal law or constituted an unreasonable determination of the facts in light of the evidence presented in state court.

### E. Batson

Lawhorn contends that during his trial the prosecution deprived him of equal protection and a fair trial "by an impartial jury comprised of a fair cross-section of the community" because the state engaged in a "racially discriminatory method of selecting a jury" in violation of the "Sixth, Eighth, and Fourteenth Amendments ...." (Document # 1, at 13). As his underlying factual basis for said violations, Lawhorn asserts that "[d]uring jury selection, the state used its peremptory challenges to exclude [8] out of [14] black venire members (57%) who qualified to serve as jurors in petitioner's capital trial. In contrast, the prosecutor struck only 10 out of 34 white venire members (29%) who qualified to serve as jurors.[7]"

**5.** *Adams v. Texas*, 448 U.S. at 43, 100 S.Ct. 2521.(*relying upon Witherspoon v. Illinois*, 391 U.S. 510, 522–23 n. 21, 88 S.Ct. 1770, 1777, 20 L.Ed.2d 776 (1968)). *see also, Turner v. Murray*, 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986); *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1987);and *Gray v. Mississippi*, 481 U.S. 648, 657–658, 107 S.Ct. 2045, 2051, 95 L.Ed.2d 622 (1987), wherein jury exclusions

related to both death bias and racial bias are discussed in depth.

**6.** The Alabama Court of Criminal Appeals listed the trial court's findings of fact with regard to this claim in *Lawhorn v. State*, 581 So.2d at 1163.

**7.** *Id.* In his response brief before this court, Lawhorn also points to co-defendant Maxine

Respondents point out that while the Alabama Supreme Court did not explicitly address the above claim on direct appeal, it did conduct an independent review of the record and found no reversible error regarding the Lawhorn's opposition to the prosecutor's peremptory challenges. (Document # 16, at 27) (*citing Ex parte Lawhorn*, 581 So.2d at 1180–81). Respondents do not dispute Lawhorn's numerical evaluation of strikes precipitated by the prosecution, but believe that his exclusive reliance upon the statistical ratio of qualified black venire members versus qualified white venire members struck by the prosecution is "insufficient to establish a prima facie case of discrimination . . . ." *Id.* at 30 (*citing Batson v. Kentucky*, 476 U.S. 79[, 106 S.Ct. 1712, 90 L.Ed.2d 69] (1986); *United States v. Allison*, 908 F.2d 1531, 1537–38 (11th.Cir.1990)). They also assert that Lawhorn himself struck three (3) qualified black venire members, and that three (3) black venire members were chosen to serve in the jury. (Document # 16, at 29). As such, respondents conclude that petitioner is not entitled to habeas relief pursuant to 28 U.S.C. § 2254(d) because "Lawhorn has not alleged, and cannot show, that the denial of relief on this claim in state court, '(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.' " *Id.* at 30–31.

Lawhorn responds that *Batson* relied upon *Castaneda v. Partida*, 430 U.S. 482, 494–95, 97 S.Ct. 1272, 1280, [51 L.Ed.2d 498] (1977), "which specifically endorsed the use of statistics to prove a prima facie case [of racial discrimination in the selection of the jury venire.]" (Document # 20, at 29). He further presents a law review article entitled " 'Selecting a Jury in Federal Criminal Trials After Batson and McCollum' 95 *Col. L.Rev.* 999 (1995), in which the use of statistics to establish a prima facie case in jury selection" was examined by DiPrima. *Id.* at 29–30. He maintains that if a statistical analysis test is performed in the manner suggested by the article to the facts of his case[8], the results show that the strikes were biased because there existed only a 5% chance that the jury would have had the same racial composition. *Id.* at 32. In other words, had the strikes been unbiased, 95% "of the time the racial composition would have been different than what occurred . . . .," a percentage which to Lawhorn is so significant in and of itself that in his case a prima facie *Batson* violation is established. *Id.*

Lawhorn also argues the Eleventh Circuit has previously indicated that statistics "showing discriminatory impact" may be relied upon to show "intentional discrimination." *Id.* (*citing United States v. David*, 803 F.2d 1567, 1571 (11th. Cir. 1986)). The Eleventh Circuit has cited *United States v. Alvarado*, 923 F.2d 253, 255–256 (2d Cir.1991), which states that " 'a challenge rate nearly twice the likely minority percentage of the venire strongly

Walker's case as a factual circumstance in support of his equal protection claim. Walker's conviction was reversed because the Alabama Court of Criminal Appeals found that a prima facie case of discrimination had been made against District Attorney Rumsey for striking "11 of the 15 black venire members (73%) as contrasted with 9 of the 36 white venire members (25%)." (Document # 20, at

33). However, Lawhorn did not present this fact to the Alabama Supreme Court on direct appeal, and as such, this court cannot consider same during its § 2254 examination of this issue.

8. Lawhorn suggests the 'Fisher exact test.' pages 923–28.

supports a prima facie case under [*Batson*].'" *Id.* (*citing Cent. Ala. Fair Housing Center v. Lowder Realty*, 236 F.3d 629, 637 (11th Cir.2000)).

Lawhorn presents a well developed factual and legal argument in support of the above equal protection claim. However, same cannot be said for the record on direct appeal. The entire factual basis presented on direct appeal in support of the equal protection claim consists of the following: "During jury selection, the State used its peremptory challenges to exclude eight black veniremembers.... Only fourteen black veniremembers were qualified to serve upon Mr. Lawhorn's capital jury and the prosecutor unlawfully excluded fifty-seven percent of the eligible black jurors." (R.30, at 10, Brief in support of Petition for Writ of Certiorari).

### Analysis

When reviewing a claim of discrimination relating to improper use of peremptory challenges at trial, the Supreme Court wrote, "As in any equal protection case, the 'burden is ...' on the defendant who alleges discriminatory selection of the venire 'to prove the existence of purposeful discrimination.'" *Batson*, 476 U.S. at 93, 106 S.Ct. 1712, *quoting Whitus v. Georgia*, [385 U.S. 545, 550, 87 S.Ct. 643, 646–647, 17 L.Ed.2d 599] (1967) (*citing Tarrance v. Florida*, 188 U.S. 519, 23 S.Ct. 402, 47 L.Ed. 572 (1903)). A defendant making allegations regarding the improper use of peremptory strikes against jurors of a suspect class "may make out a prima facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose ... Once the defendant makes the requisite showing, the burden shifts to the State to explain adequately the racial exclusion." *Id.* at 94, 106 S.Ct. 1712 (*citing Washington v. Davis*, [426 U.S. 229, 239–242, 96 S.Ct. 2040, 2047–2049, 48 L.Ed.2d 597 (1976)) ]and *Alexander v. Louisiana*,

[405 U.S. 625, 632, 92 S.Ct. 1221, 1226, 31 L.Ed.2d 536 (1972) ].

To establish a prima facie case of discrimination, the defendant must first allege that venire members were struck "from the petit jury solely by reason of their race ...." *Powers v. Ohio*, 499 U.S. 400, 409, 111 S.Ct. 1364, 1369, 113 L.Ed.2d 411 (1991). "Second, the defendant is entitled to rely on the fact ... that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.'" *Avery v. Georgia*, [345 U.S. 559, 562, 73 S.Ct. 891, 892, 97 L.Ed. 1244 (1953) ]. Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empaneling of the petit jury ... raises the necessary inference of purposeful discrimination." *Batson*, 476 U.S. at 96, 106 S.Ct. 1712.

*Batson* also instructed the trial court to consider all relevant circumstances when deciding whether the defendant had made a prima facie showing. *Id.* As one example of such a circumstance, the Supreme Court pointed out that "a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination." *Id.* at 97, 106 S.Ct. 1712. However, the Court also expressed that its examples were merely illustrative as it had "confidence that trial judges ...will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors." *Id.*

The Supreme Court's trust in the trial court's ability to determine relevant factual circumstances has resulted in an effort by the trial courts to develop objective,

statistical analyses to determine whether there has been a constitutionally significant number (*e.g.* 'pattern') of peremptory strikes against a suspect class during selection of a jury. Hence, Lawhorn's reliance on Circuit opinions favoring a finding of discriminatory inference when a challenge rate is nearly twice the likely minority percentage of the venire. While these opinions are certainly persuasive, there are other relevant factors in Lawhorn's case which weigh against an inference of discrimination. First, Lawhorn himself used three (3) peremptory challenges to strike black veniremen. Second, three (3) black veniremen were chosen to serve on the jury. With regard to the latter, the Eleventh Circuit "has held that the unchallenged presence of a particular race on a jury substantially weakens the basis for a *prima facie* case of discrimination in the peremptory striking of jurors of that race." *Central Alabama Fair Housing Center v. Lowder Realty Co., Inc. et.al.,* 236 F.3d 629, 638 (11th Cir.2000).

### Conclusion

The only information given to the Alabama Supreme Court in support of petitioner's equal protection claim was that eight out of fourteen, or 57% of the black venirepersons were removed from the jury panel by the prosecution's use of peremptory strikes. Even if this court assumes the Alabama Supreme Court reviewed the entire record after taking notice of the petitioner's underdeveloped claim, and was able to note the number of black venire persons struck by the defendant and seated on the jury as set out above, it was still within that court's discretion to determine that those facts weighed heavily against the discriminatory inference created by the prosecution's use of peremptory strikes.

In light of the limited information given to the state court and the failure to put said information into context, the under-

signed cannot recommend that a petition for writ of habeas corpus be granted. Even if the state court's independent review of the record took into account all facts relevant to this claim (in spite of the petitioner's failure to enunciate same), the United States Supreme Court's delegation of judicial discretion in these matters to the state court means that the state court's decision was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; nor was it a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Therefore, the petition for writ of habeas corpus based upon Lawhorn's *Batson* challenge is due to be denied.

### F. Illegally Obtained April 7, 1998, confession

Lawhorn contends that "while being held in custody on Saturday night, April 2, 1988," he requested counsel, but same was not provided. (Document #1, at 14). Further, his parents attempted to visit him the following day, but were refused. *Id.* Lawhorn was not afforded counsel from "'April 3 through April 7, 1988.'" *Id.* On April 7, 1988, Lawhorn gave two statements to Talladega County Officials. Prior to his first statement, Lawhorn read and waived his rights pursuant to *Miranda v. Arizona.* A two hour time period elapsed between Lawhorn's first and second statement, during which time "it was suggested to the petitioner that if he cooperated things would be better on him ...." *Id.* Lawhorn was not read a Miranda warning prior to his second statement. *Id.* At trial, the second statement was admitted into evidence over Lawhorn's objection. *Id.* He argues that the admission of the second statement violated the Fifth, Sixth, Eighth, and Fourteenth Amend-

ments to the United States Constitution. *Id.*

Respondents assert that the state appellate court "addressed and rejected this claim on direct appeal." (Document #16, at 31). After a lengthy discussion regarding the testimony given during the motion to suppress at trial, the Alabama Court of Criminal Appeals determined that Lawhorn " 'made an independent and informed choice of his own free will, that he possessed the capability to do so, and that his will was not overborne by pressures and circumstances swirling around him.....' " *Id.* at 24, *citing Lawhorn v. State*, 581 So.2d at 1167 (*quoting Bui v. State*, 551 So.2d 1094, 1107(Ala.Crim.App.1988), *aff'd*, 551 So.2d 1125 (Ala.1989)). Respondent contends 28 U.S.C. § 2254(e)(1) mandates that the district court must presume the factual findings of the Alabama Court of Criminal Appeals are correct. Respondents also assert that Lawhorn has not met his burden of persuasion regarding the voluntariness of his confession pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), nor has he shown that deputies violated his right to counsel in contravention of *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) because Lawhorn himself initiated his April 7, 1988 contact with officials, declared his willingness to waive his right to silence and counsel, and was not threatened or coerced in any manner. *Id.* at 36.

In response, Lawhorn contends that the police intentionally subjected him to five (5) days of "isolation [from requested legal counsel and family contact] to elicit an incriminating statement from [him]."

(Document #20, at 34). Further, Lawhorn avers that after his first April 7, 1988, statement, "investigator Frankie Wallace" kept telling him to stop lying, tell the truth, and that things would be better on him. *Id.* Lawhorn argues that this "psychological ploy" was tantamount to continued interrogation in violation of *Edwards*. *Id.* at 35.

This Court has already recommended that the petition for writ of habeas corpus on the basis of any Fifth Amendment violation of the petitioner's rights be denied. (*see infra*, Sections *A.* and *B.*) Moreover, the proper admission of the confession into evidence vitiates the possibility of any Eighth or Fourteenth Amendment Due Process claim. Finally, the Sixth Amendment right to counsel attaches after a defendant has been charged with an offense, and is therefore, inapplicable to the facts of the Lawhorn's action.[9]

### G. Maxine Walker's statement

Lawhorn contends that the trial court, over his objection, improperly allowed the prosecution to introduce the contents of Maxine Walker's statement through another witness on the grounds that Ms. Walker's statement "went to the issue of probable cause, despite the fact that probable cause was not at issue in petitioner's case." (Document #1, at 14–15). Maxine Walker did not testify at Lawhorn's trial, and as such, he was "effectively denied his constitutional right of cross-examination." *Id.*

Respondents assert that the above issue, while not expressly addressed by the Alabama Supreme Court, was denied on the

---

9. *McNeil v. Wisconsin*, 501 U.S. 171, 180, 111 S.Ct. 2204, 2210, 115 L.Ed.2d 158 (1991). Even if petitioner had been charged with an offense, and thereafter voluntarily waived his Fifth Amendment right to counsel pursuant to *Miranda*, the Supreme Court has ruled that while there are exceptions, "As a general mat-

ter ..., an accused who is admonished with the warnings prescribed by this Court in *Miranda* ..., has been sufficiently apprised of the nature of his Sixth Amendment rights...." *Patterson v. Illinois*, 487 U.S. 285, 296, 108 S.Ct. 2389, 2397, 101 L.Ed.2d 261 (1988).

**1194**

merits after an independent review of the record for error. (Document # 16, at 38). Therefore, a petition for writ of habeas corpus can only be granted if the state court's decision was contrary to or involved an unreasonable application of federal law. *Id.* at 39. Respondents also argue that Lawhorn's issue involves only questions of state law, or the in alternative, his complaint is without merit because Walker's statement was offered *in camera* "for the purpose of establishing probable cause of Lawhorn's warrantless arrest on April 2, 1988. . . ." and was never presented to the jury. *Id.*

The Court has reviewed this claim and concludes that there are no federal constitutional issues present. Even if a constitutional violation were present, neither Maxine Walker's statement nor any inculpatory information connected to it were ever made known to the jury at any phase of the proceeding. Therefore, Lawhorn can establish no prejudice against him, as required by *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and his petition for writ of habeas corpus is due to be denied with regard to this claim.

### H. Prosecution team witnesses

Lawhorn asserts that paralegal Ann Wallace, a member of the prosecution team, was improperly permitted to testify as to whether incriminating statements made by him were voluntary. (Document # 1, at 15). As such, his right to a fair trial was violated because the voluntariness of the alleged statements were a critical issue at trial and because of Ann Wallace's "dual role" as a prosecutor's assistant and witness. *Id.* Lawhorn also contends that Frankie Wallis, another member of the prosecution team, was allowed to testify against him at trial "in violation of his rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution." *Id.* at 15–16.

Respondents assert that the Alabama Supreme Court expressly addressed the merits of this issue on direct appeal, and therefore, this court is limited to conducting a § 2254(d) review regarding same. (Document # 16, at 40).

The state supreme court found that during voir dire the prosecutor introduced Ann Wallace and Frankie Wallis as members of his prosecution team. It concluded that Frankie Wallis' presence did not improperly influence the jury because of a longstanding rule permitting a member of the sheriff's department to remain at the prosecution table during the trial. However, the court was not pleased with Ms. Wallace's presence throughout the trial because she introduced to the jury and acted as DA Rumsey's secretary and trial coordinator and was also called as a prosecution witness. Wallace authenticated the tape recording of Lawhorn's confession and chain of custody of said tape. While the court expressed dissatisfaction with this practice, it found no reversible error because Wallace's testimony did not "concern a disputed factual matter ... material to Lawhorn's guilt or innocence." (Document # 16, at 42) [*citing Ex Parte Lawhorn,* 581 So.2d at 1181]. As the record stood, Ms. Wallace's testimony only concerned " 'the proper functioning of the tape recorder that was used to record Lawhorn's confession and ... the chain of custody of the tape,' " neither of which were disputed by the petitioner. *Id.* Based upon the foregoing, the state court found that no constitutional error occurred.

This court finds no error in the state court's reasoning in approving investigator Wallis' presence at trial. It is acceptable and constitutional for the chief investigator to be seated at the prosecu-

tion table and testify at trial. This court also shares the state court's concern about Mrs. Wallace. Such action skirts the constitutional line of prosecutorial misconduct in the form of improper vouching or bolstering of witness testimony by placing the prestige of the district attorney's office behind a witness. *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); (reversal is appropriate when prejudice resulting from prosecutorial misconduct amounts to a denial of constitutional due process.) However, because the state court's decision is neither contrary to nor an unreasonable application of existing Supreme Court or Eleventh Circuit precedent, nor based upon an unreasonable determination of the facts in light of the evidence before it, Lawhorn's petition for writ of habeas corpus with regard to this claim is due to be denied.

### I. and N. Prosecutorial misconduct at guilt and penalty phase

Lawhorn makes allegations of prosecutorial misconduct at the guilt and penalty phase of the trial. In the interest of judicial expediency, both phases shall be addressed together as they involve substantially related legal concepts.

### I. Improper Conduct during Guilt Phase

Lawhorn contends that the prosecution engaged in improper conduct and argument before and during the guilt-innocence phase of the trial, which resulted in his conviction and death sentence in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.[10]

Respondents state that these claims, while not expressly addressed by the Alabama Supreme Court, were rejected on the merits after an independent review of the record for error. Therefore, habeas

relief can only be granted if the state court's decisions are contrary to or involve an unreasonable application of federal law, or the result of an unreasonable determination of the facts presented in state court proceedings. (Document # 16, at 44).

The particular allegations of misconduct at trial and the recommendations regarding same are as follows:

(a) During voir dire, "[the] prosecution stated: 'I think the judge will charge you that sympathy and bias and that sort of thing doesn't have any place in the courtroom.'" (Document # 1, at 16) (*quoting* (R. 55)). This statement did not misstate the law since the prosecutor specifically directed the jury to listen to the trial judge's instructions at a later time. Therefore, the comment was not improper.

(b) "The prosecutor misled the jury as to the law on issues such as intent, murder for hire, and the acts of co-conspirators." *Id.* With regard to the intent instruction, Lawhorn asserts that the prosecutor improperly told the jury that "intent could be gleaned from the fact that a gun had been used by [Lawhorn]," thereby unconstitutionally placing the burden of proof on the petitioner to show lack of intent. *Id.* (*citing* (R. 444–45)).

The prosecutor's assertion that intent could be derived from Lawhorn's use of a gun was not improper in this case. While said comments would certainly be improper if no underlying factual basis for same had been presented at trial, in this action there was sufficient evidence to convince a trier of fact that Lawhorn possessed a gun for the specific purpose of killing Berry. Prosecutors are allowed to draw reasonable inferences from evidence actually presented at trial during closing argument. *see Ex parte Raines,* 429 So.2d 1111, 1113 (Ala.1982); *Smith v. State,* 745

---

10. (Document # 1, at 18).

So.2d 922, 932–33 (Ala.Crim.App.1999). Therefore, in this case, the prosecutor's act of connecting Lawhorn's possession of a weapon to the intent element of the crime was proper and did not unconstitutionally shift the burden to Lawhorn to prove that he lacked the intent to kill.

■ With regard to the murder for hire instruction, Lawhorn maintains that the prosecutor improperly "informed the jury that the State was not required to establish that the petitioner had committed the offense for compensation to prove 'murder for hire.'" *Id.* (*citing* (R. 446)). This argument is without merit. A review of the record shows that the prosecutor clearly and properly explained to the jury that to be convicted of capital murder based upon pecuniary gain, a defendant must agree to commit a murder for compensation. (R. 446). The fact that the prosecution also informed the jury that it did not matter whether the compensation was tendered before or after the murder, or not at all, is not an incorrect statement of Alabama law. *Gospodareck v. State*, 666 So.2d 835, 842 (Ala.Crim.App.1993), *affirmed Ex parte Gospodareck*, 666 So.2d 844 (Ala.1995).

With regard to the relevance of co-conspirator actions, Lawhorn claims the prosecutor improperly "suggested that the petitioner could be convicted of capital murder as a result of the intentions and actions of his co-defendants." *Id.* (*citing* (R. 447)). This argument also fails. In explaining legal complicity to the jury, the prosecutor illustrated how Lawhorn's individual acts in this particular case (*e.g.*, assisting his brother and aunt in obtaining weapons, riding in the back of a truck during the murder, etc . . .) could be considered in conjunction with the intentions and actions of his co-defendants such that Lawhorn could be held legally responsible for capital murder even if he did not pull the trigger on the weapons that killed the victim. Said explanation is not an incorrect statement of Alabama law. *Ritter v. State*, 375 So.2d 270, 274 (Ala.1979).

(c) During the guilt phase of the trial, "the prosecutor repeatedly commented on the 'cold and calculated' nature of this crime . . . ," thereby invoking his expertise and injecting his personal opinion that this crime was especially deserving of capital punishment. *Id.* at 17 (*citing* (R. 471–472)). Moreover,

(d) The prosecutor "discounted" the validity of finding the petitioner guilty of a lesser included offense, and again improperly interposed the term sympathy in connection with his personal opinion and expertise by stating, " 'But I'll tell you what arguing for lesser included offense is under this evidence. That's nothing but asking for sympathy, and I tell you what sympathy is, is (sic) letting criminals go without proper punishment, and the reason I'm up here and have so much experience is because we are reaping the benefit of past sympathies in this day's society.' " *Id.* (*quoting* (R. 468)).

■ The prosecutor's remarks made in paragraphs (c) and (d) constitute improper vouching and improper personal opinion. *Johnson v. Wainwright*, 778 F.2d 623, 630–31. (11th Cir.1985). Even though the remarks are improper, the respondents correctly point out that the burden is on Lawhorn to show that the comments rendered the proceeding so fundamentally unfair that "there is [a] reasonable probability that, had the remarks not been made, the outcome would have been different." (Document # 16, at 47). In the instant case, the evidence of guilt was so strong that there is no reasonable probability that the jury would have found Lawhorn innocent—even absent the prosecutor's improper conduct.

■ (d) The prosecutor improperly instructed the jury as to "its role in the

imposition of the death penalty leading the jury to believe it was not the responsible party for its verdict." *Id.* (*citing* (R. 466)). The record reflects that the prosecutor stated, "[Lawhorn] is trying to put this great big thousand pound weight on your shoulders that you're the responsible party at this stage if you find him guilty for giving for giving him life without and the electric chair, and that's not what we're about at this stage of the trial. It's just whether or not he's guilty, and if he's guilty what he's guilty of, and if he's innocent then turn him loose." (R. 466). The prosecutor's statement was not improper because it was not made to relieve the jury of its role in the penalty phase of the trial, but to clarify to the jury that its duty at the guilt phase of the trial was to decide only the guilt or innocence of the petitioner.

### N. Improper Conduct during the Penalty Phase

Lawhorn contends that the prosecution engaged in the following improper conduct and arguments before and during the penalty phase of the trial, which resulted in his conviction and death sentence in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

(a) Lawhorn declares that the prosecutor improperly cross-examined him by asking if the victim was " 'begging for his life,' " when there was no factual predicate for same raised at trial, either through the statements of the co-defendants, in the previous trial of Maxine Walker, or in the State Medical Examiner's report of instantaneous death, to justify an evidentiary basis to ask said question. (Document # 1, at 20–21) (*quoting* R. 557 and 500). Respondents contend that the above issue

is procedurally barred because Lawhorn was required to but did not raise this claim at trial or on direct appeal. (Document # 16, at 29–30). Respondents further assert that the state court was correct in refusing to address this issue in collateral proceedings because of same. *Id.* at 31.

The Rule 32 trial court did find that the above issue was procedurally barred. (R.437). It is well known that "[f]ederal courts are prohibited from reviewing a claim procedurally defaulted under state law if the last court to review the claim states clearly and expressly that its judgment rests on a procedural bar, and the bar presents an independent and adequate state ground for denying relief." *Davis v. Angeles,* 2000 WL 284275, \*4 (S.D.Ala. 2000) (*citing Harris v. Reed,* 489 U.S. 255, 260–61, 263, 109 S.Ct. 1038, 1042–43, 103 L.Ed.2d 308 (1989)). Therefore, this court has no jurisdiction to review the constitutionality of this claim.

(b) Second, Lawhorn claims the prosecutor again wrongfully urged the jury to "shed sympathies . . ." and also told jurors that " 'You don't come in as everyday mourners, because you have to shed those things that as all human beings we have a right to have. In a few hours when you go back home, you're entitled to again grasp those things, to feel sorry for people . . . ." *Id.* at 21. (*quoting* (R. 587)).

Lawhorn also claims that the prosecutor made various other improper comments to the jury, including: "(1) indications concerning the role of the jury with society in decline; (2) the fact that justice was equivalent to a death sentence in the petitioner's case; (3) appeals to patriotism and a citizen's right to impose death; (4) the supposed equation of the death penalty with self-defense . . ." (5) and the prosecutor improperly commented on the petitioner's failure to testify.[11]

---

11. *Id.* at 587–92. These claims were associated with improper prosecutorial behavior at

the guilt phase of the trial in the original

Respondents contend that the merits of claims set out in the first paragraph of this subsection were expressly addressed on direct appeal by the Alabama Court of Criminal Appeals and the Alabama Supreme Court, thereby precluding this court from granting habeas relief unless the state court's decisions are shown to be contrary to or involve an unreasonable application of federal law or an unreasonable determination of the facts presented in state court proceedings. (Document # 16, at 31–33). They also contend that this court should not consider the merits of (b)(1)-(4) because Lawhorn failed to set out the specific factual basis for these claims or cite any portion of the record in support of same. Respondents make the same argument for (b)(5), but still address the merits because an underlying factual basis for this claim was presented to the state court.

A review of the record shows that the remainder of the prosecutor's first comments on sympathy as well as the factual basis for complaints (b)(1)-(4) reads *in pare materia:*

Mr. Rumsey: You shed sympathies. You shed bias, and you are to judge this thing based upon the law and the evidence.... You don't come in as everyday mourners, because you have to shed those things that as all human beings we have a right to have. In a few hours when you go back home, you're entitled to again grasp those things, to feel sorry for people .... but I'll submit to you this: When you're in that jury box, that you're to decide this case based upon the law and evidence and render a true and fair verdict based upon that.

You are, in fact, as you sit in this jury box, the conscience of this community, and I'll submit this to you, that laws

without enforcement become law no more. You know, of the things that's always had (sic) a unique part about this country, what separates us from the other societies of this world is simply this; As citizens and as a country, we have always had the ability to do what is right for the necessary protection of our society, and as Americans we have always had that right. Sometimes we've been slow in doing it. We've even had the right to ask the citizens, the men and women of this country——

Mr. Fannin: Judge, I object to Mr. Rumsey making a patriotic speech. He's not arguing the evidence as to mitigating and aggravating circumstances.

The Court: What did he say?

Mr. Fannin: He's making a patriotic speech, and I object to it.

Mr. Rumsey: I am not, Your Honor. I am making a reasonable inference from the evidence.

The Court: All right. Overruled.

Mr. Rumsey: That we have a right as citizens have a duty to this country and it even goes to asking the young people of this country, the young men and women, that they may have to give their life in defense of this country, and I'll submit this to you: If we can demand that of our citizens of this country, we also have the right to demand in the appropriate situation the proper punishment for the worst of its crimes. We may honor the dead heroes of this country, we may also execute the worse (sic) criminal in this country, and I'll submit to you the evidence in this case shows that in fact if there is anybody in this courtroom today that believes in capital punishment, it's that man seated right over there, because he was the Judge,

petition. However, since the record shows that these alleged wrongdoings occurred in the sentencing phase, the court shall presume

their placement in the guilt phase of the argument was a scrivener's error.

he was the jury, and he was the executioner. He tried William C. Berry, he sentenced him to death, and he carried out the sentence right then and there without one trial; and as he takes this witness stand, I'll submit this to you: It's the merciless people who have no mercy are (sic) now begging for mercy.

I'll tell you what capital punishment is. It's an ancient doctrine of self-defense. If the citizens of this country have a right to protect their family, their children, when somebody comes into their house and they have that right under the law even to the extent of taking somebody['s] life, [who] comes into their house wanting to do them harm, then why doesn't society have the right to protect itself against the likes of James Charles Lawhorn. [He is n]ot some babe [in] the woods that's never been convicted of a crime.... This is as cold and calculated and as merciless a killing as you can get. They don't get any worse than that .... The last thing he really wants is justice, because justice is giving every man his due, and what he is due by his actions is in fact the most serious sentence that can be handed out in this courtroom.

My job is done, but you think about this when you're back there deciding: You think about where we've been, where we are, and where we are going as a society; and you stand firm for what's just, and you stand firm for what's fair, and you stand for what is right, and I ask you to speak the last word in this courtroom, and that's sentence that man to death, because that is the fair verdict, that's the just verdict, and it's the right verdict under the facts of this case. Thank you very much.

R. 586–592.

In *Johnson v. Wainwright*, 778 F.2d 623, 630 (11th Cir.1985), the Eleventh Circuit wrote, "[P]rosecutorial arguments will not warrant habeas corpus relief unless they meet two requirements. First, they must have encouraged the jury to take into account matters that are not legitimate sentencing considerations. *Brooks [v. Kemp*, 762 F.2d 1383, 1403 (11th Cir. 1985) ]. Second, they must have been so prejudicial, when viewed in the context of the entire sentencing, as to have rendered that proceeding 'fundamentally unfair.' " *Id.* at 1400 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 645, 94 S.Ct. 1868, 1872, 40 L.Ed.2d 431 (1974)).

■ The prosecutor's comments on sympathy, bias and society were not improper. They directed the jury to make a rational decision regarding Lawhorn's punishment based upon the law and the evidence. Further, the prosecutor did not infer that the jury must sentence Lawhorn to death to prevent or reclaim a perceived societal breakdown.

The prosecutor's patriotic comments, in particular those comparing the jury's duty to military persons at war, were clearly improper. "Th[e jury's] discretion is simply not analogous to the role of a solder who is ordered to kill the enemy ... [and] misrepresents the task the jury is charged by law to carry out." *Brooks v. Kemp*, 762 F.2d 1383, 1412 (11th Cir.1985), *citing Viereck v. United States*, 318 U.S. 236, 63 S.Ct. 561, 87 L.Ed. 734 (1943), and *Moore v. Reynolds*, 153 F.3d 1086, 1113 (10th Cir.1998).

■ The prosecutor's comment regarding the death penalty as societal self-defense was not improper. The United States Supreme Court has allowed prosecutorial comment on future dangerousness and has never explicitly ruled that the societal self-defense argument is *per se* improper. *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994).

■ Finally, Lawhorn contends that the prosecutor impermissibly equated justice with the death penalty by arguing that Lawhorn knew what justice was and did not want it. However, the prosecutor also stated that justice was giving every man his due, and that Lawhorn's *actions* required the most serious sentence. In other words, the evidence showed that the death penalty was appropriate punishment. Since "retribution and deterrence ...." represent proper societal purposes of the death penalty, the prosecutor's argument was not improper. *Gregg v. Georgia,* 428 U.S. 153, 183, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

■ With regard to the prosecutor's alleged comments regarding Lawhorn's silence, the burden of proof is on the habeas petitioner to establish a factual basis for the relief he seeks. *Hill v. Linahan,* 697 F.2d 1032, 1034 (11th Cir.1983); *Corn v. Zant,* 708 F.2d 549, *reh'g denied,* 714 F.2d 159 (11th Cir.1983), *cert. denied,* 467 U.S. 1220, 104 S.Ct. 2670, 81 L.Ed.2d 375 (1984). Lawhorn has failed to allege his grounds for relief with sufficient detail or clarity to demonstrate even *prima facie* evidence of a constitutional violation. The mere assertion of a ground for relief, without more factual detail, does not satisfy a petitioner's burden of proof or the requirements of 28 U.S.C. § 2254(e)(2) and Rule 2(c), *Rules Governing § 2254 Cases in the United States District Courts.*

After duly noting the objective impropriety of the prosecutor's comments regarding comparing jury's duty to that of a soldier at war, the court must now determine whether Rumsey's comments rendered Lawhorn's sentencing hearing " 'so fundamentally unfair as to deny him due process.' " *Brooks v. Kemp,* 762 F.2d at 1400 (*quoting Donnelly v. DeChristoforo,* 416 U.S. at 645, 94 S.Ct. 1868.) This court is of the opinion that Lawhorn was denied due process of law. Counsel was prejudiced because his objection was overruled by the trial court, and the district attorney was allowed to continue his argument. In many cases, objective errors can be corrected by a judge's curative instruction. Lawhorn not only received no curative instruction, but also bore the brunt of the trial court's approval of the district attorney's argument, a point which was most certainly not lost on the jury.

Moreover, since "the 'prejudice' requirement [of ineffective assistance of counsel claims as illustrated by *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)], is directly analogous to the fundamental fairness inquiry ..." of prosecutorial misconduct claims, additional discussion of the fundamental fairness aspect of this claim shall be discussed along with any prejudice inquiries in *Section U* below.[12]

## J. Erroneous Reasonable Doubt Instruction

Lawhorn contends that the trial judge's instructions to the jury on reasonable doubt at the guilt-innocence phase, when read in its entirety, impermissibly relieved the prosecution of its burden of proving Lawhorn's guilt beyond a reasonable doubt. (Document # 1, at 18). As a result, Lawhorn declares that his right to due process, a fair trial, freedom from cruel and unusual punishment, and other rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United

---

12. *Id.* In other words, "the [*Strickland*] Court acknowledged that fundamental fairness, the same standard adopted in *Donnelly,* is the governing principle in reviewing errors of counsel. The use of the 'reasonable probability' test to elaborate the underlying principle suggests its applicability to other areas in which fundamental fairness is the guide." *Id.* at 1401.

States Constitution were violated. *Id.* As his factual basis therefore, Lawhorn claims that the trial court erred when it "stated that the jury must find 'an actual substantial doubt' (R. 485) in order to acquit.... In so defining 'reasonable doubt,' the court materially understated the stringency of the State's proper burden of persuasion." *Id.*

Respondents contend that although the Alabama Supreme Court did not expressly address this issue on direct appeal, it did conduct an independent review of the record and no reversible error was found. (Document # 16, at 62). Therefore, a petition for writ of habeas corpus cannot be granted on this claim unless the state court's decision "was contrary to or involved an unreasonable application of clearly established law" or "was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." *Id.*

The trial judge's instructions to the jury relating to reasonable doubt are as follows:

[T]he burden of proof is on the State of Alabama. The Defendant is always presumed to be innocent. The fact that he has been arrested and indicted and brought before the Bar of Justice creates no presumption against him at all. But he comes into Court clothed with this presumption of innocence, and it remains with him throughout the trial as an evidentiary fact in his favor; that is, a matter of evidence which must be considered by you until it is overcome by evidence which proves his guilt to each [of] the twelve of you who will be deliberating this case beyond a reasonable doubt and to a moral certainty. (R. 484–485).

Now, you'll want to know what a reasonable doubt is. When I say The State is under the burden of proving his guilt beyond a reasonable doubt and to a moral certainty, that does not mean that the State must prove an alleged crime beyond every imaginable or speculative doubt or beyond all possibility of mistake, because that would be impossible. A reasonable doubt means an actual substantial doubt arising out the testimony in a case, or it could arise from a lack of testimony in a case. It is a doubt for which a reason can be assigned and the expression to a moral certainty means practically the same thing as beyond a reasonable doubt, because if you are convinced to a point where you no longer have a reasonable doubt, then you are convinced to a moral certainty. *Id.*

■■■ It is well known that "[t]he government must prove beyond a reasonable doubt every element of the charged offense." *Victor v. Nebraska,* 511 U.S. 1, 3, 114 S.Ct. 1239, 1241, 127 L.Ed.2d 583, (1994) (*citing In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)). However, the constitution neither requires nor prohibits courts from defining reasonable doubt to juries. *Id.* at 5, 114 S.Ct. 1239. "Rather, 'taken as a whole, the instruction [must] correctly conve[y] the concept of reasonable doubt to the jury.'" *Id.* (*quoting Holland v. United States,* 348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954)). In reviewing the constitutionality of such an instruction, "the appropriate standard is whether there exists a 'reasonable likelihood' that the jury read the instruction to lower the required threshold." *Johnson v. Alabama,* 256 F.3d 1156, 1192 (11th Cir.2001) (citing *Estelle v. McGuire,* 502 U.S. 62, 72, 112 S.Ct. 475, 482, 116 L.Ed.2d 385 (1991)) (other citations omitted).

Lawhorn asserts that the trial court's definition of reasonable doubt impermissibly lowered the prosecution's burden of proof because it equated 'reasonable doubt' with 'actual substantial doubt.' In his reply

brief on application for writ of certiorari to the Alabama Supreme Court, Lawhorn also complained that the trial court failed to articulate 'moral certainty' in the context of evidentiary certainty. (Tab 32, page 15). He relies solely upon *Cage v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990) to support his contention that the foregoing instructions were constitutionally inadequate, thereby entitling him to a new trial.

Lawhorn's case is not an exact replica of *Cage*. In *Cage*, the trial court improperly defined reasonable doubt as tantamount to grave uncertainty and an actual substantial doubt. *Victor v. Nebraska*, 511 U.S. 1, 5, 114 S.Ct. 1239, (citing *Cage*, 111 S.Ct. at 329). In Lawhorn's case, the trial court defined reasonable doubt as an actual substantial doubt, but made no reference to grave uncertainty.

■ While the Supreme Court has agreed that even equating reasonable doubt with actual substantial doubt is "problematic," the instruction still passes constitutional muster if the trial court also explains that the phrase actual substantial doubt is the antithesis of "a doubt arising from mere possibility, from bare imagination, or from fanciful conjecture." *Id.* at 20, 114 S.Ct. 1239. (other citations omitted). In other words, if the trial court "makes clear that 'substantial' is used in the sense of existence rather than magnitude of the doubt ...," any ambiguities created by the phrase have been rectified and the instruction is constitutionally sound. The trial court properly connected actual substantial doubt to an imaginable or speculative doubt in the petitioner's action, and as such, there is no reasonable likelihood that the jury interpreted the instruction to lower the prosecution's burden of proof.

The use of the phrase 'moral certainty,' standing alone, has also been considered questionable, because it "might not be rec-ognized by modern jurors as a synonym for 'proof beyond a reasonable doubt.'" *Victor v. Nebraska*, 511 U.S. at 14, 114 S.Ct. 1239. Unless the remainder of the instruction "lends content to the phrase," the inherent ambiguities of 'moral certainty' could certainly render the instruction unconstitutional.

■ In Lawhorn's case, the trial court explained to the jury, "A reasonable doubt means an actual substantial doubt arising out the testimony in a case, or it could arise from a lack of testimony in a case. It is a doubt for which a reason can be assigned and the expression to a moral certainty means practically the same thing as beyond a reasonable doubt, because if you are convinced to a point where you no longer have a reasonable doubt, then you are convinced to a moral certainty." (R. 484–85). Moreover, the court also stated that Lawhorn would be presumed innocent as "a matter of evidence which must be considered by you until it is overcome by evidence which proves his guilt to each [of] the twelve of you who will be deliberating this case beyond a reasonable doubt and to a moral certainty." *Id.* The trial court's explanation of 'moral certainty' in the present case is satisfactory because it informed the jury that the phrase was synonymous with reasonable doubt and that reasonable doubt must arise from the evidence presented to them.

There is no evidence that the state court made a decision which was contrary to or involved an unreasonable application of clearly established law or was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, Lawhorn's petition for writ of habeas corpus is due to be denied with regard to his claims concerning the trial court's reasonable doubt instruction.

### K., L., and M. Heinous, Atrocious, or Cruel Instruction

Lawhorn presents three separate arguments in his original petition for writ of habeas corpus stemming from his contention that an improper jury instruction given by the trial court was unconstitutional, thereby mandating reversal of his sentence. (Document # 1, at 18).

### K. Constitutionally deficient instruction by the trial court.

Lawhorn asserts that the trial court's "instruction [regarding the aggravating factor heinous, atrocious, and cruel ("HAC")] gave the jury no guidance concerning the meaning of any of its terms and was erroneous because it did not including a limiting definition as required by the Supreme Court." *Id.* at 19, 114 S.Ct. 1239. As a result of this alleged error, the trial court improperly sentenced the petitioner to death in violation of his right to due process, to be free from cruel and unusual punishment, and his Fifth, Sixth, Eighth, and Fourteenth Amendment rights under the United States Constitution. *Id.*

### L. Constitutionally deficient harmless error analysis by the appellate court.

While the Alabama appellate court openly recognized the constitutional inadequacy of the trial court's jury instruction, Lawhorn contends that it too, erred by finding the improper instruction to be harmless error because Alabama appellate courts are not allowed to "reweigh or conduct harmless error review to remedy constitutional errors in sentencing unless state law permits reweighing when an aggravating circumstance is improperly before the jury..." *Id.* (*citing Clemons v. Mississippi*, [494 U.S. 738,] 110 S.Ct. 1441[, 108 L.Ed.2d 725] (1990); *Ex parte Williams*, 556 So.2d 744, 745 (Ala.1987)). The only factual basis in support of this claim is that

the co-defendants' crimes were not considered HAC. This factual assertion is presented for the first time in this petition. In his responsive brief, petitioner also faults the state appellate court by contending that the victim's death was instantaneous, and therefore the manner of killing could not be considered torturous.

### M. Improper interpretation of the Alabama Death Penalty Statute by Alabama Courts has rendered the application of the statute unconstitutional.

Finally, Lawhorn contends that the 'especially heinous, atrocious or cruel' factor of the "Alabama Death Penalty Statute, as construed by the Alabama Appellate Court ... is unconstitutionally vague." *Id.* To support this claim, he points out that the factual circumstances in his case and his co-defendants' cases were the same, yet there was no heinous, atrocious or cruel finding in either of his co-defendants' cases. *Id.*

Again, the factual basis for this claim has not been brought forth until now. Lawhorn concedes this omission, but argues that the claim should not be procedurally barred because until the state action became a final judgment in October 1999, "there was no indication by any Alabama appellate court that 'manner of killing' for the same crime could be 'especially heinous, atrocious or cruel' for one defendant but not so for another. The failure of Alabama appellate courts during the 1990s to follow consistently *Kyzer*, ... *Clemons*, [and] *Maynard* is an objective factor external to [petitioner] which constitutes 'cause' within the meaning of *Murray v. Carrier*, 477 U.S. 478, 488, [106 S.Ct. 2639, 2645, 91 L.Ed.2d 397] (1986)." (Document # 20, at 68, n. 22).

*Analysis*

The opposing parties agree that the district court is guided by the principles of 28 U.S.C. § 2254(d)(1) when conducting a review of the first two (2) claims. Accordingly, a writ of habeas corpus shall only issue if this court finds that the Alabama court rulings were contrary to or involved an unreasonable application of federal law, or involved an unreasonable determination of the facts in light of the evidence presented in state court.

The trial court's only instruction to the jury regarding the heinous, atrocious or cruel aggravating factor was: " 'Another one that you could consider but is not proven by a verdict is that the capital offense was especially heinous, atrocious, or cruel, compared with other capital offenses as set out in Subdivision 8 defining aggravating circumstances.' " *Id.* at 19 (*citing* (R. 595)).

■ Without question, the trial court's failure to provide the jury with language to limit or clarify the 'especially heinous, atrocious, or cruel' instruction rendered the instruction unconstitutionally vague in violation of the Eighth Amendment of the United States Constitution. *Clemons v. Mississippi*, 494 U.S. at 740, 110 S.Ct. 1441; *Maynard v. Cartwright*, 486 U.S. 356, 361–64, 108 S.Ct. 1853, 1857–59, 100 L.Ed.2d 372 (1988); *Godfrey v. Georgia*, 446 U.S. 420, 428–29, 100 S.Ct. 1759, 1765, 64 L.Ed.2d 398 (1980).

However, the Alabama Court of Criminal Appeals recognized the trial court's error on direct appeal. *Lawhorn v. State*, 581 So.2d at 1174. State law does prohibit the Alabama appellate courts from reweighing the aggravating and mitigating circumstances presented at trial.[13] However, contrary to Lawhorn's position, Alabama appellate courts are afforded authority to conduct harmless error review of this issue. Rule 45, A.R.A.P. Therefore, a curative review of the evidence surrounding the HAC factor may be conducted to determine if any error resulting from the trial court's mistake was harmless in light of the fact that Alabama has limited the application of said factor to crimes of such a nature that [are] " 'conscienceless or pitiless' " and " 'unnecessarily torturous to the victim . . . .' " *Id.* at 1174–75, *citing Ex parte Whisenhant*, 555 So.2d 235, 244 (Ala. 1989, *cert. denied* 496 U.S. 943, 110 S.Ct. 3230, 110 L.Ed.2d 676 (1990) (*quoting Ex parte Kyzer*, 399 So.2d 330, 334 (Ala.1981)).

In this case, the appellate court conducted its harmless error review by comparing the facts presented at trial and Alabama's narrowed interpretation of the HAC factor to determine "whether beyond reasonable doubt the result would have been the same had the circumstance been properly defined in the jury instructions." *Id.* at 1177. In applying the latter inquiry, the appellate court found that "the jury's improper consideration of this aggravating circumstance and possibly improper consideration by the trial court did not render appellant's sentencing fundamentally unfair" because:

[t]here is no question, at all, that, had the jury been properly instructed, it

13. *Id.* at 1176–77, (*citing Ex parte Williams*, 556 So.2d 744 (Ala.1987)). Even if Alabama interpreted its state law to allow appellate review of this particular trial court error in the form of reweighing aggravating and mitigating circumstances or harmless error review, same would not be contrary to federal law. In *Clemons v. Mississippi*, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725, the Supreme Court concluded "that the Federal Constitution does not prevent a state appellate court from upholding a death sentence that is based in part on an invalid or improperly defined aggravating circumstance either by reweighing of the evidence of the aggravating and mitigating evidence or by harmless error review." *Id.* at 1444.

would still have returned a recommendation of death because the facts presented to the jury established, beyond any doubt, that this crime was especially heinous, atrocious, or cruel when compared to other capital offenses. The evidence of this circumstance is so overwhelming; the facts so conclusively establish that no rational jury, properly instructed, could have found otherwise. The evidence is unconflicting that appellant directly participated in a conscienceless, pitiless, torturous murder. Berry's last minutes were obviously filled with terror, fear, and knowledge that his death was imminent, and he experienced a high degree of prolonged pain before his death. All of this was accomplished by appellant with complete indifference— complete indifference to Berry's pain and terror and complete indifference to the value of human life, which he found to be worth $50. Clearly, this evidence sets the crime apart, for the degree of heinousness, atrociousness, and cruelty of this offense exceeds that which would be common to all capital offenses. By any standard acceptable to civilized society, this crime was outrageously wicked and shockingly evil. In fact, appellant admitted, during the sentencing phase, that as the victim lay entangled in the underbrush and unable to talk, but gurgling, he repeatedly shot the victim and, at the time, did not care whether the victim died or not.[14]

Lawhorn takes issue with the state appellate court's contention that no rational jury, properly instructed, would have decided to sentence him to anything but the death penalty. As evidence to the contrary, he argues that for sentencing purposes, Alabama's statutory heinous, atrocious and cruel aggravating factor[15] is analyzed by placing, "the emphasis ... on the manner of the killing, not on the defendant's actual participation." (Document # 20, at 67). (citing Ex parte Bankhead, 585 So.2d 112, 125 (Ala.1991)). He also asserts that two rational judges (one of whom also sat at petitioner's trial) properly applied this instruction to the co-defendants' cases and found no HAC factor in either. Based upon the foregoing, Lawhorn concludes that the Alabama Court of Criminal Appeals' harmless error finding is unsound because "the manner of killing was the same with respect to all three defendants" and two trial judge's found that the same crime was not heinous, atrocious or cruel." Id.

As further support for his contention that the appellate court's opinion is faulty, Lawhorn points to uncontroverted evidence presented throughout the trial, and accepted by the appellate court, which showed the victim's death was an instantaneous, execution style killing. Id. at 66. Finally, he believes the appellate court provided no factual or explanatory basis for its conclusory assertion that the victim suffered prolonged pain before his death. Id.

It appears Lawhorn finds no error with the state court's factual finding and legal conclusion that the crime was conscienceless or pitiless. Therefore, the first prong of Alabama's limited interpretation of the HAC factor is not in dispute. The remainder of this analysis, then, shall focus on the second prong of the limiting interpretation

14. Id. Respondents are correct in their assertion that the factual findings of the Alabama Court of Criminal Appeals are to be presumed correct. 28 U.S.C. 2254(e). Unlike other instances of the state appellate record where the court relied upon 'factual findings' which were either nonexistent or blatantly inapposite to the actual record, the factual findings made by the state courts with regard to Lawhorn's confession are based upon an accurate reflection of the evidence in the trial record.

15. Set out in the Code of Alabama, 1975, § 13A–5–49(8).

(was the crime especially torturous to the victim?) as well as the meaning of the phrase 'manner of killing' and its relation to the limited HAC factor.

When conducting its harmless error review on direct appeal the state appellate court did not consider the absence of the HAC factor in either of the co-defendants' cases. Moreover, petitioner did not present same in any collateral proceedings. Because the HAC factor in the co-defendants' cases is raised for the first time in this petition as a factual basis supporting habeas relief for this claim, the court is procedurally barred from considering it.

Lawhorn also contends that the murder cannot be considered torturous because the shots fired from either of the weapons caused instantaneous death, a fact which was accepted by the appellate court. He suggests that the court's use of the phrase 'prolonged pain' contradicts its finding of instantaneous death (and should therefore be disregarded), and openly argues that a finding of instantaneous death completely abrogates the existence of any factual basis for concluding the victim's death was unnecessarily torturous. Whether or not the ambiguities of the 'prolonged pain' reference are resolved, the trial court made it very clear that its decision was also based upon the fact that the victim's last minutes were filled with terror, fear, and knowledge that his death was imminent. Torture encompasses both physical and mental pain, and same was properly considered by the appellate court. see Hardy v. State, 804 So.2d 247 (Ala.Cr.App.1999), judgment affirmed, 804 So.2d 298 (Ala.2000), cert. denied, 534 U.S. 1043, 122 S.Ct. 621, 151 L.Ed.2d 543 (2001).

Finally, 'manner of killing' in the HAC context is synonymous with the phrase 'conscienceless or pitiless and unnecessarily torturous.' Petitioner does not dispute that the manner of killing was conscienceless or pitiless, and since unnecessarily torturous takes into account both physical and mental pain, this court does not find that the appellate court's harmless error review was contrary to or involved an unreasonable application of federal law or constituted an unreasonable determination of the facts in light of the evidence presented in state court.

Lawhorn contends that his third argument regarding the HAC factor should not be procedurally barred due to objective external factors beyond his control. Specifically, he asserts that he had no reason to believe that the state appellate court could find that the HAC factor existed in his case, when there was no HAC factor found in either of his co-defendants' cases. Therefore, until his case became final in October, 1999, he could not have predicted that the state appellate court would not uphold the HAC section of the Alabama Death Penalty statute.

Lawhorn's contention is without merit. "In order to show cause for not raising a claim in an earlier petition, a petitioner must show 'some external impediment preventing counsel from constructing or raising the claim.'" High v. Head, 209 F.3d 1257, 1262 (11th Cir.2000) citing McCleskey v. Zant, 499 U.S. 467, 497, 111 S.Ct. 1454, 1472, 113 L.Ed.2d 517 (1991). "Examples of objective factors external to the defense that constitute cause include interference by officials and 'a showing that the factual or legal basis for the claim was not reasonably available to counsel.'" Id. at 1263 (citing Murray v. Carrier, 477 U.S. at 488, 106 S.Ct. 2639).

The factual and legal basis for this claim arose when Lawhorn was convicted and sentenced. It was at that point the inconsistent HAC factor findings became apparent. Lawhorn could have compared his case to Maxine Walker's case as persuasive argument to prevent a finding of the heinous, atrocious or cruel factor at his

sentencing hearing, in a motion for new trial or on direct appeal. Lawhorn has failed to present any proof that the HAC factor was ever proposed as an aggravating factor in Mac Lawhorn's action, and therefore it is excluded from this court's consideration. Further, Lawhorn could have been presented this claim in his petition for writ of certiorari, and certainly at any level of the state collateral proceedings. Because he has failed to show legal cause for his failure to present this claim prior to the present petition, this court is procedurally barred from considering the merits of same.

### O. Trial court's 'murder for hire' instruction made death penalty mandatory

Lawhorn contends that the trial judge "mandated the existence of an aggravating factor creating a presumption of death[,]" when it "instructed the jury at the sentencing phase of the trial that 'by your verdict finding the Defendant guilty of murder for hire, that establishes the Subdivision Number Six [that the capital offense was committed for pecuniary gain] as an aggravating circumstance.'" (Document # 1, at 22). Lawhorn believes this construction "operated to remove from the jury an inquiry critical to determining [his] sentence and unconstitutionally shifted the burden onto [Lawhorn] to show that the mitigating circumstances outweighed the aggravating circumstances.[,]" thereby causing him to be sentenced to death in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution. *Id.*

Respondents assert that the Alabama Court of Criminal Appeals examined this claim on direct appeal and properly determined that under Alabama statutory law, the dual use of an aggravating circumstance to satisfy an element of the offense during the guilt phase as well as a factor to be considered in the sentencing phase is not precluded. Further, respondents contend that the "constitutionality of such a statutory scheme has been upheld by the United States Supreme Court in *Lowenfield v. Phelps*, 484 U.S. 231, 241–46, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988)." (Document # 16, at 93). Finally, respondents assert that no burden shifting occurred because, whether this aggravating circumstance overlapped the guilt and sentencing stage of the trial, the respondents were still required to establish the existence of that circumstance beyond a reasonable doubt.

After careful review of the record, the positions presented by both parties, and applicable federal law, it is recommended that Lawhorn's request for writ of habeas corpus be denied.[16] There is no evidence that the state court's decision was contrary to or involved an unreasonable application of applicable federal law or constituted an unreasonable determination of the facts in light of the evidence presented in state court.

### P. Interview with parole officer

Lawhorn contends that he was "interviewed on several occasions by a parole officer who later recommended the death penalty in a pre-sentence report submitted to the court . . . . in violation of the petitioner's rights under the Fifth and Fourteenth Amendments to the United States

---

**16.** See *Tuilaepa v. California*, 512 U.S. 967, 971, 114 S.Ct. 2630, 2634, 129 L.Ed.2d 750 (1994) (*citing Lowenfield v. Phelps*, 484 U.S. 231, 244–246, 108 S.Ct. 546, 554–555, 98 L.Ed.2d 568 (1988)) wherein the Supreme Court stated, "the trier of fact must convict the defendant of murder and find one 'aggravating circumstance' (or its equivalent) at either the guilt or penalty phase. . . . The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both)."

Constitution." (Document #1, at 23). Respondents contend this issue was not raised on direct appeal and therefore was properly denied by the trial court when presented in Lawhorn's Rule 32 petition based upon a procedural bar. (Document #16, at 36).

A review of the record shows that the respondents are correct. "[A]bsent proof of cause and prejudice, federal courts are prohibited from reviewing a claim procedurally defaulted under state law if the last court to review the claim states clearly and expressly that its judgment rests on a procedural bar, and the bar presents an independent and adequate state ground for denying relief." *Davis v. Angeles*, 2000 WL 284275, *4 (S.D.Ala.2000) (*citing Harris v. Reed*, 489 U.S. 255, 260–61, 263, 109 S.Ct. 1038, 1042–43, 103 L.Ed.2d 308 (1989)). Therefore, this court is precluded from reviewing this claim.

### Q. Improper Pre-sentence Report

Lawhorn contends that the trial court "improperly received and considered a pre-sentence investigation report replete with objectionable and prejudicial assertions of opinion and fact." (Document #1, at 23). As his basis therefore, Lawhorn asserts that: (1) he and trial counsel received the pre-sentence report on the day of the sentencing hearing when Alabama law mandates that it should be received prior to the hearing, (2) the probation officer improperly wrote that in his opinion, Lawhorn should receive the death penalty in the report, (3) the probation officer gave his opinion regarding the credibility of Lawhorn and witnesses at trial, and (4) the report is replete with "highly prejudicial assertions that lack any foundation in the evidence, that have no proper bearing on the sentence, that consist of hearsay (some of it from unidentified sources), or that constitute nothing more than rank speculation." *Id.* at 24. As a result, Lawhorn was sentenced to death in violation of "his

right to confrontation, his rights to due process and fair trial, his right against cruel and unusual punishment, his right to meaningful appellate review, and other rights secured by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution." *Id.*

Respondents assert that the above issue was adjudicated on the merits in state court and is therefore, subject to § 2254(d) review before this court. (Document #13, at 37). They also contend that the Alabama Appellate Court's findings of fact should be presumed correct, and that Lawhorn's failure to develop a factual basis for his argument precludes this court from holding an evidentiary hearing concerning same. *Id.* at 38. Finally, respondents contend that Lawhorn has failed to state a claim because his allegations involve only state law. *Id.* at 38–39.

Lawhorn's counsel testified that he could not remember whether he received the pre-sentence investigation report the day before or the day of the petitioner's sentencing hearing. Counsel voiced no objections to the timeliness of his receipt of the report nor did he object to any information contained within the report.

While the Alabama Court of Criminal Appeals did " 'not approve or condone' " of the probation officer's recommendation in the pre-sentence report, it found that any error resulting therefrom was harmless, stating that " '[T]he mere presence of information in the pre-sentence report which should not be considered for the purpose of enhancing punishment is not, *per se*, prejudicial.' " *Lawhorn v. State*, 581 So.2d at 1171 (*citing (Kuenzel v. State*, 577 So.2d 474, 527 (Ala.Cr.App.1990)) (*quoting Johnson v. State*, 521 So.2d 1006, 1013 (Ala. Crim.App.1986), affirmed, 521 So.2d 1018 (Ala.),cert. denied, [488] U.S. [876], 109 S.Ct. 193 [102 L.Ed.2d 162] (1988))).

The appellate court was convinced ·that "the sentence of the trial [court] was based upon [its] own determination of the existence of and [its] weighing of aggravating and mitigating circumstances," by carefully reviewing the trial court's orders, which it found to be in compliance with § 13A–5–47(d). It also noted that the appellate court relied upon the same considerations as the *Kuenzel* court. *Id.* Specifically,

As did the court in *Kuenzel,* the trial court in this case stated, in its order that, after having 'carefully read, studied, and considered the Pre–Sentence Report,' it concluded that 'nothing contained in the Pre–Sentence Report would in the opinion of the Court, constitute a mitigating circumstance as provided in either Section 13A–5–1 or 13A–5–2.' The trial court entered specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A–5–49, of each mitigating circumstance enumerated in § 13A–5–51, and of any additional mitigating circumstances offered pursuant to § 13A–5–52. The court further noted the witnesses offered to establish any further nonstatutory mitigation. Unlike the trial court in *Kuenzel,* the instant trial court did not set out the specific evidence which appellant had offered as non-statutory mitigating circumstances.

In concluding its findings in regard to the penalty phase, the instant court stated that following, which is very similar to the Kuenzel court's conclusion:

'The Court having considered the aggravating circumstances, the Pre–Sentence Investigation Report, the absence of mitigating circumstances, the facts of the case in hand as brought forth by the testimony and by the exhibits in the case, and the jury's recommendation of a death sentence by a vote of 11–1, there is only one logical conclusion being that he should suffer the · punishment of death by electrocution as provided by law and should be executed for the crime he has committed.'

Finally, the instant court, with language virtually identical to that of the Kuenzel order, concluded its determination of sentence with the following:

The Court finds that the conduct of the Defendant, James Charles Lawhorn, constituted a brutal, aggravated, merciless and intentional killing for hire of the victim, William Clarence Berry. The Court further finds that the recommendation of the jury as to the punishment to be Imposed was fully justified by the facts and circumstances of the case, together with the process of weighing the aggravating and mitigating circumstances.

The Court further finds the sentence of Death was not recommended by the jury under influence of passion, prejudice, or any arbitrary factor.'

*Id.* at 1171–72.

Thus, the appellate court concluded that " 'the recommendation of punishment by the parole officer was not an influencing factor in the trial [court's] determination of sentence.' " *Id.* (*citing Kuenzel,* 577 So.2d at 528.)

### *Analysis*

■■■ Petitioner's complaints that the parole officer improperly expressed that petitioner had no remorse for the crime, should not have given his opinion as to the credibility of witnesses at trial, his opinion that petitioner's background was normal, and recommendation of the death penalty fail to raise a constitutional question. The trial judge had ample opportunity and is afforded great deference in his ability to determine the demeanor and credibility of witnesses. There was sufficient evidence presented at the penalty

hearing from which the trial court could have drawn the same conclusion as the parole officer, without any reliance on the parole officer's opinion. For instance, it was the petitioner himself who testified at the penalty hearing that he did not care at the time of the murder whether the victim lived or died. The trial judge was able to observe the intellect of the petitioner as well. Moreover, the petitioner's family testified at the penalty hearing, the same family from which the parole officer derived his information regarding a 'normal childhood.' Again, the trial judge had an opportunity to observe these witnesses and gauge for himself whether petitioner's background should be considered a mitigating circumstance. Trial judge's are presumed to understand the law and their responsibility in connection therewith, including the fact it is their decision to determine whether the death penalty is appropriate.

Accordingly, this court does not find that the appellate court's decision was contrary to or involved an unreasonable application of federal law, or an unreasonable interpretation of the facts based upon the evidence before it. The trial judge set out all of the evidence he reviewed in making his sentencing decision, and the parole officer's report was only one of many listed factors.

For the foregoing reasons, the petition for writ of habeas corpus with regard to trial court error in consideration of the pre-sentence investigation report is due to be denied.

### R. Trial court failure to consider mitigating circumstances

Lawhorn contends that the trial "court disregarded or failed to give proper weight to information in the record relating to the existence of mitigating circumstances.... As a result, the petitioner was denied his right not to be sentenced to death without full consideration of all factors that might call for a penalty less than death and otherwise denied his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution."

Respondents assert that the above issue was adjudicated on the merits in state court and is therefore, subject to § 2254(d) review before this court. (Document # 13, at 39). They also contend that Lawhorn's failure to develop a factual basis for his argument precludes this court from holding an evidentiary hearing concerning same. *Id.* at 40. Finally, respondents contend that Lawhorn has failed to state a claim because he presents only an issue of state law, and deny any factual averments made in support of same. *Id.* at 40.

The burden of proof is on the habeas petitioner to establish a factual basis for the relief he seeks. *Hill v. Linahan*, 697 F.2d 1032, 1034 (11th Cir.1983); *Corn v. Zant*, 708 F.2d 549, *reh'g denied*, 714 F.2d 159 (11th Cir.1983), *cert. denied*, 467 U.S. 1220, 104 S.Ct. 2670, 81 L.Ed.2d 375 (1984). Consequently, a petitioner must provide substantial evidence to meet his burden of proof to show why federal post-conviction relief should be awarded. *Douglas v. Wainwright*, 714 F.2d 1532, *reh'g denied*, 719 F.2d 406 (11th Cir.1983), *vacated on other grounds*, 468 U.S. 1206, 104 S.Ct. 3575, 82 L.Ed.2d 874 (1984) and 468 U.S. 1212, 104 S.Ct. 3580, 82 L.Ed.2d 879 (1984), *on remand* 739 F.2d 531 (11th Cir.1984). Petitioner has the burden of establishing sufficient facts to warrant a finding of a denial of his constitutional rights. *Tyler v. Beto*, 391 F.2d 993, 995 (5th Cir.1968). That burden is to demonstrate at least *prima facie* evidence establishing the alleged constitutional violation.

In this case, Lawhorn has failed to allege his grounds for relief with sufficient detail or clarity to demonstrate even *prima facie* evidence of a constitutional viola-

tion. The mere assertion of a ground for relief, without more factual detail, does not satisfy petitioner's burden of proof or the requirements of 28 U.S.C. § 2254(e)(2) and Rule 2(c), *Rules Governing § 2254 Cases in the United States District Courts.* Accordingly, his petition for writ of habeas corpus is due to be denied with regard to this claim.

### S. Lawhorn's sentence unconstitutionally harsh compared to similar cases.

Lawhorn contends that Alabama law and the United State's Constitution "forbids the imposition of the death penalty when the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the petitioner." (Document #1, at 25). Lawhorn then asserts that his punishment is disproportionate to other similar cases, and therefore violates his constitutional rights. *Id.*

Respondents assert that the above issue was adjudicated on the merits in state court and is therefore, subject to § 2254(d) review before this court. (Document #13, at 41). They also contend that the Alabama Appellate Court's findings of fact should be presumed correct, and that Lawhorn's failure to develop a factual basis for his argument precludes this court from holding an evidentiary hearing concerning same. *Id.* at 42. Finally, respondents contend that petitioner has failed to state a claim because he presents only an issue of state law. *Id.* at 42–43.

Lawhorn has failed to allege his grounds for relief with sufficient detail or clarity to demonstrate even *prima facie* evidence of a constitutional violation. The mere asser-

tion of a ground for relief, without more factual detail, does not satisfy petitioner's burden of proof or the requirements of 28 U.S.C. § 2254(e)(2) and Rule 2(c), *Rules Governing § 2254 Cases in the United States District Courts.* Accordingly, his petition for writ of habeas corpus is due to be denied with regard to this claim.

### T. Ineffective Assistance of Trial Counsel

Lawhorn presents a sizable number of claims pertaining to the ineffectiveness of trial and appellate counsel. Respondents have answered by asserting that the claims are procedurally barred or without merit. The Court will first determine whether any claims are procedurally barred. Thereafter, all remaining claims will be examined in accordance with the appropriate standard of review.

*The question of procedural default.*

Respondents contend that claims (1)-(3) below are procedurally barred because they were not raised in a Rule 32 petition or collateral appeal.[17] It is true that "[a]ny [failure] to raise those claims until now means that [Lawhorn] deprived the state courts of 'the first opportunity to hear the claim[s] sought to be vindicated in a federal habeas proceeding.'" *Bailey v. Nagle,* 172 F.3d 1299, 1305 (11th Cir.1999) (citing *Picard v. Connor,* 404 U.S. 270, 276, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971)). Moreover, if said claims are unexhausted, this court may also find that the claims are "procedurally defaulted, even absent a state court determination to that effect, if it is clear from state law that any future attempts at exhaustion would be futile." *Id.* (*citing Snowden v. Singletary,* 135

17. Lawhorn's general answer to the procedural default defenses raised by the respondent is based upon his belief that the trial court's (and therefore the appellate court's) Rule 32 opinion should not be considered a judgment "on the merits" of the issues as required by the Anti-Terrorism Act because the trial judge adopted verbatim a proposed order written by the district attorney's office. This contention is without merit.

F.3d 732, 737(11th Cir.), *cert. denied,* 525 U.S. 963, 119 S.Ct. 405, 142 L.Ed.2d 329 (1998)).

The aforementioned claims and this Court's recommendation concerning same are as follows:

1. That trial counsel was ineffective in that he failed to present the *Riverside* issue at trial or on appeal.

> *Conclusion:* This claim is not procedurally barred, nor was trial counsel ineffective for the reasons set out in the *Riverside* discussion herein. (*see infra,* Sections *A.* and *B.*)

2. That trial counsel was ineffective at the penalty phase, sentencing phase, and on appeal for his failure to object to or present the appellate court with an argument that the instructions given to the jury regarding the 'heinous, atrocious, or cruel' aggravating circumstance were unconstitutionally vague.

> *Conclusion:* This claim was addressed on the merits by the state appellate court on collateral appeal, and therefore, is not procedurally barred from federal review. *Lawhorn v. State,* 756 So.2d at 990. Further, trial counsel was not ineffective for failing to present a vagueness argument in relation to the aggravating factor for the reasons set out in the '*Heinous, Atrocious, or Cruel*' discussion herein. (See *infra,* Sections *K., L.,* and *M.*).

3. Trial counsel was ineffective at the penalty and sentencing phase of the trial because he failed to ask the jury or trial judge to save the petitioner's life.

> *Conclusion:* This claim was presented at the Rule 32 hearing and was specifically referenced in the Alabama Court of Criminal Appeals' recitation of the trial judge's determination concerning the failure of counsel to present a closing argument. Therefore, it is not procedurally barred from federal review. However, counsel did ask

the jury to sentence Lawhorn to life without parole at the penalty phase, and therefore counsel was not ineffective. (R.501). Counsel did not, however, ask the trial judge to spare Lawhorn's life at the sentencing phase. A discussion concerning this allegation shall be addressed later along with the ineffective assistance of counsel claims which were ruled on the merits.

Respondents also contend that claims (4)-(7) below are procedurally barred because they were raised in the Rule 32 proceeding, but were not raised (or not properly raised) on collateral appeal. The state appellate court also found that some of these issues were presented in Lawhorn's notice of appeal, but declined to review them because " ' "[A]llegations ... not expressly argued on ... appeal ... are deemed by us to be abandoned." ' " *Lawhorn v. State,* 756 So.2d at 993, (*citing United States v. Burroughs,* 650 F.2d 595, 598 (5th.Cir.), cert. denied, 454 U.S. 1037, 102 S.Ct. 580, 70 L.Ed.2d 483 (1981)). (other citations omitted).

"Under the procedural default doctrine, [this Court] will not consider on federal habeas review a claim that was not adequately presented to the state court in compliance with the state's procedural requirements." *Brownlee v. Haley,* 306 F.3d 1043, 1064 (11th Cir.2002); *Edwards v. Carpenter,* 529 U.S. 446, 451, 120 S.Ct. 1587, 1591, 146 L.Ed.2d 518 (2000); *Sims v. Singletary,* 155 F.3d 1297, 1311 (11th Cir.1998)(state court finding that argument 'abandoned' on appeal is a finding of default based upon state court procedural grounds).

Quite simply, "federal courts are prohibited from reviewing a claim procedurally defaulted under state law if the last court to review the claim states clearly and expressly that its judgment rests on a procedural bar, and the bar presents an inde-

pendent and adequate state ground for denying relief." *Davis v. Angeles,* 2000 WL 284275, *4 (S.D.Ala.2000) (*citing Harris v. Reed,* 489 U.S. 255, 260–61, 263, 109 S.Ct. 1038, 1042–43, 103 L.Ed.2d 308 (1989)). The court shall examine claims (4)-(7) below to determine whether they are procedurally barred from this court's review.

4. Trial counsel was ineffective at the guilt phase and on appeal for his failure to investigate or present a cohesive defense theory and focus on relevant issues.

 *Conclusion:* This claim is procedurally barred as set out above because it was not raised on collateral appeal, as required by the Alabama Rules of Appellate Procedure.

5. Trial counsel was Ineffective at the penalty and sentencing phase for his failure to investigate and develop evidence relating to mitigating circumstances for use at the guilt and penalty phase, even though evidence was available.

 *Conclusion:* As it relates to investigation of mitigating circumstances for use at the guilt phase of the trial, this claim is procedurally barred as set out above because it was not raised on collateral appeal, as required by the Alabama Rules of Appellate Procedure.

 Although the appellate court ruled that the failure to investigate mitigating circumstances for use at the penalty phase of the trial was also procedurally barred because it was not raised on appeal, the court still addressed the merits of same in its opinion. *Lawhorn v. State,* 756 So.2d at 988–89. Under the plain statement rule, a federal district court may consider a claim "when a state court's decision created an ambiguity over whether the decision was based on the merits or on the application of a pro-

cedural bar." *Morrison v. Thigpen,* 1995 WL 914616, *6 (M.D.Ala.1995) (*citing Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)). Because the state court created such an ambiguity, this claim is not procedurally barred from review.

6. Trial counsel was ineffective at the penalty and sentencing phase for his failure to consult, or consult adequately with the petitioner about petitioner's right to testify at the guilt and penalty phase of the trial. Counsel also ineffectively examined the petitioner at the penalty phase. Moreover, counsel failed to adequately prepare the petitioner and defense witnesses at the sentencing phase.

 *Conclusion:* Although the appellate court ruled that this claim was procedurally barred because it had been abandoned on appeal, the court still addressed the merits of same in its opinion. Under the plain statement rule, a federal district court may consider a claim "when a state court's decision created an ambiguity over whether the decision was based on the merits or on the application of a procedural bar." *Morrison v. Thigpen,* 1995 WL 914616, *6 (M.D.Ala.1995) (*citing Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)). Because the Alabama Court of Criminals created such an ambiguity, this claim is not procedurally barred from review. Moreover, there is absolutely no evidence that Lawhorn abandoned this claim on appeal since it was argued in his initial appellate brief as well as his reply brief.

7. Trial counsel was ineffective in that he failed to present meritorious issues on appeal, including but not limited to those issues presented in the Rule 32 petition.

*Conclusion:* To the extent that this claim refers to issues concerning ineffectiveness which were not raised in his petition, same are procedurally barred as set out above, because they were not raised on collateral appeal, as required by the Alabama Rules of Appellate Procedure.

*Claims previously adjudicated on their merits.*

When determining whether to grant habeas relief on an issue which was addressed on the merits in state court, this Court must adhere to "28 U.S.C. § 2254(d)(1)'s requirement that a state decision be 'contrary to' or involve 'an unreasonable application of clearly established Federal Law.'" .... Section 2254(d)(1)'s 'contrary to' and 'unreasonable application' clauses have independent meaning. A federal habeas court may grant relief under the former clause if the state court applies a rule different from the governing law set forth in this Court's cases, or if it decides a case differently than this Court has done on a set of materially indistinguishable facts .... The federal court may grant relief under the latter clause if the state court correctly identifies the governing legal principle from this Court's decisions but unreasonably applies it in the particular case. *Bell v. Cone,* 535 U.S. 685, 122 S.Ct. 1843, 1845–1846, 152 L.Ed.2d 914, (2002) (*citing Williams v. Taylor,* 529 U.S. 362, 405–406, 120 S.Ct. 1495, 146 L.Ed.2d 389. [ (2000) ] ).

A review of the Rule 32 proceeding and the present action shows Lawhorn and respondent agree the *Strickland* standard is the appropriate legal principle upon which the state court was to test Fannin's alleged ineffectiveness. Therefore, this Court may only grant the petitioner relief if the state court action reveals an unreasonable application of the *Strickland* standard or a decision contrary to precedential cases containing material facts which are indistinguishable from Lawhorn's case.

In *Fortenberry v. Haley,* 297 F.3d 1213, 1225, (11th Cir.2002), this Circuit explained the *Strickland* principle as follows:

"Under the Sixth Amendment, a criminal defendant is entitled to receive effective assistance of counsel in conducting a defense. In order to show a violation of this right sufficient to merit reversal, a defendant must satisfy the familiar two-prong test that the Supreme Court articulated in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984):

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Under this test, the proper standard for attorney performance is that of 'reasonably effective assistance'— conduct we evaluate on the facts of the particular case, as viewed at the time of counsel's actions, to determine if the performance fell within the wide 'range of professionally competent assistance.' *Id.* at 687, 690, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. With regard to the second prong of the test, *Strickland* explains that prejudice exists where 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* at 690, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674.

*I. Ineffective Assistance of Counsel before and during the guilt phase.*

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that make particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Fortenberry,* 297 F.3d at 1225, (*citing Strickland,* 466 U.S. at 691, 104 S.Ct. 2052). We have held assistance ineffective when counsel ignored 'red flags' that any reasonable attorney would have perceived to demand further investigation. *Id.* at 12, (*citing Cunningham v. Zant,* 928 F.2d 1006, 1018 (11th Cir.1991)).

Lawhorn asserts that trial counsel did not discuss the case with him, present any trial strategy to him, discuss a potential conflict of interest concerning defense co-counsel with him, or conduct meaningful discovery. As a result of the foregoing errors, Lawhorn alleges that trial counsel failed to discover aspects of his case which would have been beneficial to his defense. In particular, Lawhorn believes that "Fannin's failure to adequately investigate [his] history of drug and alcohol use, especially his use of drugs on March 31, 1988, and his background in general, [constitutes ineffective] assistance of counsel." [18]

As evidence in support of his allegations, Lawhorn points to Fannin's fee declaration sheet, which shows that he spent only 14.5 hours out-of-court in preparation for trial, 8 of which were spent pursuing a fruitless jurisdictional defense. The remaining time period consisted of spending a total of 5.5 hours with the petitioner over three separate meetings, and 1 hour preparing a motion. Fannin's recollection of his meetings with Lawhorn consisted of legal information normally exchanged between defense counsel and client, and Lawhorn admitted that Fannin had explained that his trial strategy was to make the prosecution prove its case by keeping Lawhorn's confession from the jury.

During those three meetings Fannin brought Steve Giddens, defense co-counsel, who also was the prosecutor's brother. Lawhorn discovered the connection between the brothers through jail-house gossip. Neither Fannin or Giddens ever explained the connection to Lawhorn, nor was he ever reassured that all communication between he and his counselors would remain confidential. While Lawhorn stated that his knowledge of the connection caused him to feel uncomfortable about speaking openly with trial counsel, Lawhorn did not question counsel about it, nor did Lawhorn ever reveal what information he would have divulged to counsel had he been more confident of their loyalty to him.

Lawhorn also complains that Fannin's investigatory skills were lacking because Fannin failed to conduct meaningful discovery. However, petitioner does not reveal what, if any, beneficial information would have been found if additional discovery had been carried out.

The state court's conclusion that trial counsel effectively investigated Lawhorn's case is neither contrary to nor an unreasonable application of federal law, nor an unreasonable determination of the facts in light of the evidence presented to it. The Court recognizes that Lawhorn also asserts that trial counsel's inadequate investigation of his case caused counsel to fail to present the jury with an accurate history of his drug and alcohol use (especially on the day of the murder), and his background in general. However, because these alleged failures are also key to Law-

---

**18.** *Id.* at 38.

horn's ineffectiveness claims in the subsections below, they shall be addressed therein on the grounds of judicial expediency. Even if it could be said that counsel's investigation was desultory in these areas, the evidence of guilt at the trial phase was so strong that this Court does not find that, even absent counsel's deficient performance, there exists a reasonable probability the jury would have acquitted Lawhorn. Accordingly, Lawhorn's request for habeas relief with regard to the above claims is due to be denied.

## II. *Ineffective assistance of counsel during the guilt phase and on direct appeal.*

a. Failure to object to the prosecutor's peremptory strikes against black venire members on *Batson* grounds and failure to present same on appeal.

Lawhorn's claim is without merit. At the time of his 1989 trial, the Supreme Court had not yet rendered its decision in *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). *Powers* announced a new rule which grants a defendant the right to challenge the prosecution's peremptory strikes of jury veniremembers on the basis of race, regardless of the race of the defendant or veniremember. Lawhorn's trial counsel was not ineffective for failure to argue a rule of law which was not in effect at the time of the trial. Further, appellate counsel did raise a *Batson/Powers* challenge on direct appeal in his petition for writ of certiorari to the Alabama Supreme Court, and that court denied the claim on the merits. Finally, Lawhorn has failed to make a *prima facie* showing of discrimination in the present action, as discussed in *Section E., infra.* Lawhorn has not shown that his trial counsel was objectively deficient in connection with this claim.

b. Failure to lay a foundation so that the second confession could be found involuntary.

As set out in *Sections A, B,* and *F,* the second confession was voluntary. Therefore, trial counsel was not objectively deficient for failing to lay a foundation for the suppression of same.

c. and d.

c. Failure to lay a foundation for a jury instruction regarding voluntary intoxication on the day of the crime.

d. Failure to pursue an alcohol and drug use expert to produce a history of drug and alcohol use and the petitioner's state of mind at the time of the offense.

There was no evidence presented at the guilt phase of the trial showing that Lawhorn was under the influence of any substance on the day of the crime. The only evidence regarding Lawhorn's general drug use was presented by his sister during the penalty phase, and she simply stated that Lawhorn had used drugs. There were no follow up questions after this statement.

At the Rule 32 hearing, Lawhorn testified that he used marijuana early on the morning of March 31, 1988. (R.32, at 222). In the afternoon he used Class A narcotics, K–2 Dilaudids and marijuana, which made him feel "extremely high." *Id.* When asked if being high caused him to mellow out, Lawhorn answered "yes." *Id.* at 245. He agreed that this particular high made him feel "drunkish," and he felt that way while in the woods waiting for the victim. *Id.* at 247. Lawhorn also stated that he "wasn't clearheaded, but ... wasn't really, truly, messed——blasted or messed up real bad, but I wasn't clearheaded, no." *Id.* at 247–48. Lawhorn expressly denied that the high caused him to become depressed or made him "get up and [go] ... like an amphetamine would...." *Id.* at

245. Nor did it slow him down, cause him to pass out, prevent him from moving around, make him stagger, or make him forget things. *Id.* at 247. Lawhorn explained that unless someone looking at him knew he had done the drugs, they would not know he was high. *Id.* at 248. He described the potential external symptoms of use as red eyes and slurred speech. *Id.* When asked if the drugs had taken over his thinking process, Lawhorn stated, "Dilaudid's a mind altering drug, you know. As clear as you could think being on drugs." *Id.* at 249.

On collateral appeal, the Alabama Court of Criminal Appeals affirmed the trial court's ruling that there was "no indication of any significant drug or alcohol abuse at the time of the offense, which would provide for ... a defense [of voluntary intoxication] ..." *Lawhorn v. State,* 756 So.2d at 989.

▮ In Alabama, "[t]he degree of intoxication required to show that a defendant was incapable of forming an intent to kill is a degree so extreme as to render it impossible for the defendant to form the intent to kill." *Ex parte Bankhead,* 585 So.2d 112, 121 (Ala.1991). Even if the evidence presented at the Rule 32 hearing had been presented at trial, and the trial court allowed a jury instruction regarding voluntary intoxication, there is no reasonable probability that the jury would have accepted the defense of voluntary intoxication.

The undersigned recommends that the petition for writ of habeas corpus be denied on this ground because the state court's decision was neither contrary to nor involved an unreasonable application of clearly established federal law. Further, it was not an unreasonable determination of the facts presented before it.

Finally, Lawhorn provides no factual basis for his assertion that trial counsel was deficient for failing to have the testimony of a drug and alcohol expert to testify as to his drug and alcohol history and state of mind at the time of the offense during the guilt phase of the trial. The burden of proof is on the habeas petitioner to establish a factual basis for the relief he seeks. *Hill v. Linahan,* 697 F.2d 1032, 1034 (11th Cir.1983); *Corn v. Zant,* 708 F.2d 549, *reh'g denied,* 714 F.2d 159 (11th Cir.1983), *cert. denied,* 467 U.S. 1220, 104 S.Ct. 2670, 81 L.Ed.2d 375 (1984). Therefore, Lawhorn has not shown that trial counsel was objectively deficient with regard to these claims.

d. Failure to object to the reasonable doubt jury instruction and argue same on appeal.

As set out in *Section J,* the trial court delivered a constitutionally sound reasonable doubt instruction to the jury. Therefore, trial counsel was not objectively deficient for failing to object to the instruction.

III. (*Section U* in Lawhorn's petition) *Ineffective counsel at the penalty and sentencing phase.*

Prior to conducting an analysis concerning Lawhorn's ineffectiveness claims during the sentencing phase, it is understood that

Where a petitioner's counsel was deficient at sentencing, the relevant question for determining prejudice is whether the 'entire postconviction record, viewed as a whole and cumulative of mitigation evidence presented originally, raised a reasonable probability that the result of the sentencing proceeding would have been different if competent counsel had presented and explained the significance of all of the available evidence.'

*Fortenberry,* 297 F.3d. at 1229 (*citing Williams v. Taylor,* 529 U.S. 362, 399, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). Therefore, unless the finding of an objec-

tively deficient performance in a subsection below, due to its particular nature, merits singular discussion of its prejudicial effect within that subsection, all examinations concerning prejudice shall be addressed after claims III.(a-i) have been studied for objective deficiency.

a. Counsel should have presented evidence concerning the outcome of co-defendants' actions.

Lawhorn argues that the absence of the HAC factor in his co-defendants' cases [19] should have been brought forth during the penalty phase of the trial and on appeal. With regard to Mac Lawhorn, petitioner has never shown that the HAC factor was presented to the jury or judge as a potential aggravating factor at his trial. This Court simply cannot assume the fundamental premise of Lawhorn's argument in this area and then carry on an analysis concerning same.

Although it is clear that the HAC factor in Maxine Walker's case was considered and rejected, and this information could have been presented during Lawhorn's trial or on appeal for persuasive purposes, the state courts refused to consider same during the collateral proceedings because Walker's conviction had been reversed on *Batson* grounds. Even if Walker's case had been considered, a finding of no HAC factor in Walker's case did not require the court to find the HAC factor in Lawhorn's action unconstitutional. Certainly, it is perplexing that the HAC factor was found in one co-defendants' case but not another considering Alabama's longstanding inter-

pretation of its statutory HAC factor. Still, however incongruous these findings are, it does not result in the automatic conclusion that the factor in Lawhorn's case must have been wrongly decided. *see supra, Section L.*

■ For the foregoing reasons, this Court cannot conclude that the state court's decision was contrary to or involved an unreasonable application of federal law, nor was it an unreasonable determination of the facts in light of the evidence presented to it. Lawhorn's petition for habeas relief with regard to this claim is due to be denied.

b.,c., and d. The court shall consider these claims together since (b) lays the groundwork for the argument presented in (c), and (c) likewise lays the groundwork for the argument presented in (d).

b. Failure to investigate the petitioner's background.

c. Failure to investigate and develop evidence relating to mitigating circumstances for use at the penalty phase of the trial, even though evidence was available.[20]

d. Failure to seek expert testimony at all phases of the trial for mitigation purposes.

Lawhorn contends that trial counsel's failure to investigate his background also resulted in a failure to seek and develop evidence, including expert testimony for mitigation purposes. With regard to this issue, the Alabama Court of Criminal Appeals quoted the trial court, stating:

---

19. Walker's sentencing hearing took place on December 15, 1988. *Walker v. State,* 586 So.2d 49 (Ala.Crim.App.1991). Mac Lawhorn's sentencing hearing took place on July 6, 1989. *Lawhorn v. State,* 574 So.2d 970, 971 (Ala.Crim.App.1990). Therefore, it is impossible for trial counsel to have presented any information regarding Mac Lawhorn's case at the penalty and sentencing phase of the petitioner's trial.

20. To the extent that this allegation concerns testimony of Lawhorn's troubled youth by family members and testimony from the victim's wife that she believed Maxine Walker was responsible for the crime, same shall be considered in a separate subsection designated (e) and (f) below.

'This claim of ineffective assistance is without merit. On February 22, 1989, trial counsel filed a motion for funds to employ a psychiatrist. At the Rule 32 hearing, Fannin testified that he filed this motion because it is a good idea to have a psychiatrist in capital cases to present mitigating circumstances. Fannin filed this motion though Lawhorn did not appear to be insane and was not delusional or hallucinating. Fannin testified at the Rule 32 hearing that the court granted his motion and ordered that someone from the Talladega Mental Health Center perform the evaluation, which was the standard practice in this circuit at that time. Fannin testified that had the Talladega Mental Health Center found a problem with Lawhorn that he probably would have been taken to the Taylor Hardin Secure Medical Facility for further evaluation. Fannin received a copy of the confidential intellectual assessment from Gary Garner. Fannin testified that there was nothing in this assessment which could have been used as mitigation.'

. . .

'. . . [T]rial counsel clearly pursued expert assistance and testimony for use at Lawhorn's trial. There was nothing significant before trial counsel which indicated that Lawhorn had an alcohol or drug problem. *There was not deficient performance by counsel because counsel did not seek more psychiatric assistance than was allowed by the trial court.* Further, Lawhorn has failed to prove prejudice from this alleged failure.'

(C. 466–67.) (Emphasis added.)

The trial court also noted that Fannin had hired an investigator who found nothing significant to report about alcohol and drug use. Additionally, the trial court noted that Lawhorn did not reveal to his trial counsel that he had a drug or alcohol problem.

*Lawhorn v. State,* 756 So.2d at 988.

The appellate court then agreed with the trial court's determination that counsel had conducted a reasonable, substantial investigation into all plausible lines of defense. *Id.* It expressly pointed to the lack of information provided by Lawhorn to Fannin in support of its conclusion. It also concluded that the mental evaluation and investigator's report provided "no ground for . . . a finding of a mitigating circumstance." *Id.* at 988–89.

Fannin initially refused an express offer by the trial court to grant Lawhorn a psychological evaluation, even though Fannin knew that such an evaluation, " 'particularly in the penalty phase of the trial . . . to determine whether there might be some mitigating circumstances shown . . . ,' " is a " 'good idea in any capital case . . . ' " (Document # 20, at 47) (record citation omitted).

Fannin did file a motion requesting psychological assistance later, and subsequently received an evaluation from a counselor at the Talladega Mental Health Center which showed only that Lawhorn was competent to stand trial and assist in his defense, facts which were already known to and uncontested in Fannin's own eyes. Further, although Garner's assessment also indicated that Lawhorn drank alcohol at age 12 and was of low average intelligence in his "intellectual assessment," it is undisputed by Fannin and Dr. Beidleman that Garner (who may have a masters degree in counseling) could not diagnose Lawhorn with a mental illness nor did he perform any intelligence testing. (*Id.* at 48 and 21; *see also,* Exhibit B).

The appellate court specifically referenced only the drug and alcohol expert aspect of Lawhorn's allegations, so this

claim shall be addressed first. Since it appears the appellate court tacitly agreed with the trial court's opinion regarding Lawhorn's expert testimony on mental illness and intellectual ability, this aspect of possible mitigating evidence will be examined in connection with the Rule 32 trial court's order.

### Drug and alcohol expert

This Court must respect the state court's discretionary authority to credit Fannin's testimony that Lawhorn never informed Fannin he had a drug or alcohol problem. Fannin also testified that Lawhorn's mother and sister "may have mentioned it ..." during their meeting with him, but he could not recall anything specific. (R.32, at 74). Although it is astounding that Fannin testified the investigator's report only mentioned insignificant alcohol and marijuana use without elaboration[21], especially since Lawhorn's mother spoke of intravenous drug use, and his loss of employment and criminal activities as a result thereof in the report, Fannin's error is immaterial when all other evidence relating to Lawhorn's drug use is viewed in totality.

The state court found the report contained no information at all relating to serious drug and alcohol use. At first glance, it appears that the state court misinterpreted the facts presented in the report. However, a careful review of the trial court's order shows that the trial judge gave less credence to testimony presented by Lawhorn's family (from which the information in the report was obtained) because he found them to be biased. (R.32, at 455). He also found that Lawhorn's own testimony that he could quit using drugs whenever he wanted to belied all previous indicators that Lawhorn was a drug addict, including the substance abuse diagnosis by Dr. Beidleman or Dr. Renfro.

(*Id.* at 457–58). As such, the trial court found Lawhorn to be a recreational drug user. *Id.*

Fannin testified that he would have presented Lawhorn's drug and alcohol abuse to the jury as mitigating evidence "[i]f we had any real evidence of it." *Id.* at 67. When asked if a Talledega County jury would consider it mitigating evidence, Fannin responded, "It would depend on the extent of it and the seriousness of the habit, I think. Mr. Lawhorn never indicated to us he had a drug habit or alcohol habit." *Id.* In response to a hypothetical question regarding how a Talladega County jury would respond to a defendant had it been proven to them that the defendant was not the ringleader and was under the influence at the time of the crime, Fannin testified, "I don't think in [Lawhorn's] case it would have made any difference." *Id.* at 80. When asked why, Fannin stated, "Well, the way it happened, the way the confession came out, and the way— I mean, I don't want to sit here and talk like Mr. Rumsey, but I could describe it to you, and I won't do that, but in this case a Talladega County jury wouldn't have done anything differently." *Id.* at 81.

Whether Fannin was referring to Lawhorn's confession to law enforcement or Lawhorn's testimony before the jury is unknown, but either provided crucial evidence from Lawhorn's own mouth regarding guilt and apathy toward the death of the victim. Moreover, Lawhorn testified at the Rule 32 hearing that his drug use had little impairment upon his system the day Berry was killed.

The trial judge wrote that in his 36 years of practice in Talladega County, evidence of recreational drug use hurt rather helped a defendant's mitigating circumstances, and found that a significant drug

---

21. *Id.* at 66.

history would not be viewed as mitigating evidence. (R.32, at 458). On several occasions, the Eleventh Circuit has acknowledged the danger of presenting a significant drug and alcohol history as mitigation evidence since "in an assessment of trial realities, [it] provides an independent basis for moral judgment by the jury...[which] 'might [be] harmful to [a defendant's] case' even though offered for mitigation." *Cade v. Haley,* 222 F.3d 1298, 1305 (11th Cir. 2000) (*citing Waldrop v. Jones,* 77 F.3d 1308, 1313 (11th Cir.1996)).

The state court's factual analysis and legal findings show its conclusion, that trial counsel was not ineffective for failing to present expert testimony relating to Lawhorn's serious substance abuse, is neither contrary to nor an unreasonable application of federal law, nor is it based upon an unreasonable determination of the facts presented to it.

*Other Psychological Expert Testimony*

Although the state appellate court did not specifically address any other aspect of Lawhorn's ineffective assistance claims with regard to expert testimony, it did find generally that the Rule 32 hearing produced no evidence of a mitigating factor in relation to expert testimony which would have undermined any confidence in the sentence. Therefore, it must be presumed that the appellate court affirmed the factual and legal findings of the trial court with regard to Lawhorn's intelligence level.

Other than substance abuse, neither Beidleman or Renfro diagnosed Lawhorn with any other mental disorders. The two experts agreed that Lawhorn's intelligence test scores indicated that Lawhorn had borderline intellectual functioning. Both also agreed that in 1989 the Alabama Department of Corrections diagnosed the petitioner as being borderline mentally deficient. Both indicated that Lawhorn had adaptive skills. However, while Renfro was convinced that those adaptive skills were of sufficient import to classify Lawhorn as having low average intellectual ability, Beidleman maintained that the raw intelligence test scores were correct.

Renfro conceded that he gave the intelligence test to Lawhorn two weeks after Beidleman administered his intelligence test and acknowledged that normally the test would not be administered more than once within such a short time frame because the practice factor associated with it could result in a higher test score on the second. However, he argued that the numerical difference between his score and Beidleman's score was so great that it fell outside the differences normally associated with the practice factor.

Finally, Beidleman expressed that based upon his study of Lawhorn, Lawhorn was a dependent personality, someone who could be led by others. Renfro took issue with Beidleman's analysis, stating he did not understand the basis upon which Beidleman made such a finding. Renfro also testified that there was nothing in the testing that he (Renfro) performed or background materials he studied from which he could draw the conclusion that Lawhorn was easily influenced.

The trial court credited the testimony of Dr. Renfro and found that "Lawhorn functions in the low average range of intelligence." The [court] observed Lawhorn during his testimony and finds him to be a rather articulate individual for some with an 8th grade education. The fact that Lawhorn is of low average intelligence would not have been seen as mitigating evidence by a jury in Talladega County. (R.32, at 460).

It was within the state court's discretion to credit the testimony of Dr. Renfro as opposed to Dr. Beidleman, and this Court finds no reason to thwart the state court's factual finding. Both the factual analysis and legal findings of the state court that

show its conclusion that trial counsel was not ineffective for failing to present expert testimony relating to Lawhorn's intelligence level is neither contrary to nor an unreasonable application of federal law, nor is it based upon an unreasonable determination of the facts presented to it. Accordingly, the petition for writ of habeas corpus with regard to this claim is due to be denied.

e. Failure to consult, or consult adequately with the petitioner about petitioner's right to testify at the guilt and penalty phase of the trial. Counsel also ineffectively examined the petitioner at the penalty phase. Moreover, counsel failed to adequately prepare the petitioner and defense witnesses at the sentencing phase.

Petitioner contends that his trial counsel "did not even discuss the penalty phase of the trial until *after* the jury returned a guilty verdict, and then only briefly." (Document # 20, at 60). The entire direct examination of the petitioner by trial counsel consisted of three questions [22]:

**Fannin:** This is James Lawhorn?

**Lawhorn:** Yes, sir.

**Fannin:** And Mr. Lawhorn, you indicated to me that you would like to take the stand at this time and make a statement to the jury in your behalf, so tell them anything you want to tell them at this point.

**Lawhorn:** Members of the jury, I know I was wrong and I want you all to know I know I was wrong, and I'd like to say please have mercy on me. I want you all to know that I know I was wrong. I was led and I was wrong. I should not have did it. I'm sorry. That's all I have to say.

**Fannin:** Nothing else?

**Lawhorn:** Nothing else.

Fannin also did nothing to rehabilitate Lawhorn after he had been cross-examined by DA Rumsey. Finally, petitioner argues that "Fannin ... failed to prepare critical witnesses for their testimony during this phase of the trial." *Id.* at 61. The record reveals that Fannin had one conversation with the petitioner's mother and sister at their instigation, the substance of which Fannin could not remember. It also shows that Fannin never talked to any of the other witnesses until immediately before the penalty phase of the trial began.

In their opinion regarding this issue, the Alabama Court of Criminal Appeals quoted the trial court's order:

'[T]he testimony of [the witnesses at the Rule 32 hearing] was cumulative of the testimony presented at the penalty phase of the trial. Trial counsel's performance was not "outside the wide range of professionally competent assistance" simply because they (sic) failed to present evidence that would have been cumulative of other evidence presented at trial. See, *Waters v. Thomas,* 46 F.3d 1506, 1517–1518 (11th Cir.1995). The Constitution does not guarantee a perfect trial but rather guarantees a fair trial and a competent attorney. *Engle v. Isaac [Isaac],* 456 U.S. 107, 134, [102 S.Ct. 1558, 1575, 71 L.Ed.2d 783] (1982); *Waters v. Thomas,* supra. In this case, Lawhorn was given a fair trial and he was represented by competent attorneys.'

(C. 456.)

We too have compared the testimony presented at Lawhorn's trial and the testimony presented at the Rule 32 hearing and find that the evidence presented was essentially the same. While Lawhorn urges us to believe that more graphic details elicited during the penalty phase may have had an influential

---

**22.** *Id.* at 60–61, (*citing,* R. 544–545.)

impact on the jury, this is pure speculation, especially considering the fact that Lawhorn, himself and his mother during his trial, begged for mercy. Lawhorn has not shown that his counsel's performance was deficient in this regard; nor has he shown that he was prejudiced by his counsel's performance."

*Lawhorn v. State,* 756 So.2d at 986.

Immediately prior to the above quote of the trial court order, the trial judge also made the following factual findings:

Jerry Lawhorn, Debra Lawhorn, Datherline Lawhorn and Shirley Hudson were all members of Lawhorn's family. Each of them displayed a strong bias toward Lawhorn. Each admitted that they loved him and wanted to help him. One of these witnesses, Jerry Lawhorn, testified that he was unavailable to testify at his brother's trial because he was working to support his family. Since Jerry was unable to attend his brother's trial, it is hard to find Lawhorn's trial counsel ineffective for not presenting this testimony. The [court] does not give the testimony of these witnesses much weight because of their clear bias towards Lawhorn.

(R.32, at 455).

In addition to Jerry Lawhorn's inability to appear at trial, the trial court also correctly pointed out that Datherline Lawhorn was aware that Lawhorn had been charged with capital murder but made no effort to attend Lawhorn's trial. (R.32, at 453). Moreover, Datherline's testimony was for the most part a description of Lawhorn's drug use, a fact which would not have been considered favorable to the jury. *Id.*

Neither the trial court nor appellate court directly addressed Lawhorn's contentions that he was not informed or prepared concerning his right to testify, that he was improperly examined by counsel, and that his witnesses were not properly

prepared to testify. Instead, they concluded that counsel was not objectively deficient in the areas about which Lawhorn complains because a comparison of the testimony of the witnesses at trial and the Rule 32 hearing uncovered only cumulative evidence, and as such, established no prejudice.

■ The state court's determination that trial counsel was not objectively deficient for failure to present the testimony of Jerry Lawhorn and Datherline Lawhorn is neither contrary to nor involves an unreasonable application of clearly established federal law, nor was it an unreasonable determination of the facts in light of the evidence before it. These witnesses were aware of and chose not to assist Lawhorn at trial. Counsel cannot be faulted on this basis.

With regard to the remaining witnesses, this Court has reviewed the testimony of Lawhorn, his mother and sister at the penalty hearing and the Rule 32 hearing. After careful consideration of same, it is of the opinion that the state court's ruling that said testimony was cumulative is neither contrary to nor involves an unreasonable application of clearly established federal law, nor was it an unreasonable determination of the facts in light of the evidence before it.

Therefore, this Court recommends that petitioner's writ of habeas corpus be denied with regard to this claim.

f. Failure to introduce testimony from the victim's widow that she did not believe that petitioner was the true perpetrator of the crime.

Fannin testified that he could not remember being told by Lawhorn's mother that the victim's widow believed that petitioner had been influenced by Maxine Walker. Therefore, he could not and did

not refute the testimony presented by Shirley and Debra Hudson.

However, when discussing this claim, the trial court stated, "While this evidence would have supported the testimony that Lawhorn was influenced by Maxine it would have had little, if any, weight on the jury's consideration because of this witness['] obvious bias against Maxine Walker. Maxine Walker was having an affair with Mrs. Berry's husband. (the victim). Thus, trial counsel correctly told Shirley Hudson that the conversation with the victim's widow was not important." (R. 457).

The state court's decision is an unreasonable determination of the facts in light of the evidence before it and an unreasonable application of federal law. Ms. Berry could have provided insight as to the alleged manipulative and demanding nature of Maxine Walker, and said information was critical to the theory of the defense. It is inconceivable that the state court would conclude that same would have little weight with the jury. The lack of her testimony undermines confidence in the jury's recommendation of death. Trial counsel was ineffective for failing to present this information to the jury.

g. Failure to make a closing argument at the penalty and sentencing phase of the trial.

Lawhorn believes the Alabama courts' ruling that trial counsel's failure to make a closing argument at the penalty phase did not constitute ineffective assistance was an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, which in turn resulted in a decision that was contrary to or involved an unreasonable application of clearly established law as determined by the United States Supreme Court. The Rule 32 appellate court held that the decision of trial counsel not to make a closing argument was a strategic decision entitled to deference. Petitioner asserts that a strategic decision made on a misunderstanding of the law is entitled to less deference according to *Dobbs v. Turpin*, 142 F.3d 1383, 1389 (11th Cir.1998) (*citing Horton v. Zant*, 941 F.2d 1449 (11th Cir.1991)). At trial, the following colloquy took place:

**Fannin:** The Defendant waives closing argument in this phase of the trial, Your Honor. We object to the State making any further closing arguments.

**Rumsey:** We have the right—Your Honor, we have one argument, and it's split from the front to the back, and we still have the right to argue. There is [an] Alabama Supreme Court case on it. I don't have it at my fingertips, but we have a right, even if he does not argue, we have a right because ours is a split argument to open and to close and we have a right.

**Court:** Is it a recent case?

**Fannin:** They opened and closed if I . . . don't argue, Judge.

**Rumsey:** No Sir. That is the law in a civil case, Your Honor, but it is not in a criminal case.

**Court:** If you're sure about it.

**Rumsey:** Yes, Sir.

**Fannin:** I object, Your Honor.

**Court:** All right.

Thereafter, District Attorney Rumsey proceeded with his closing argument.

At the Rule 32 hearing, Fannin agreed that preparation of an opening and closing argument is an important part of a capital case "[b]ecause of the seriousness of the case, because of possible penalty if a client [is found] guilty." (R.32, at 48). Fannin also agreed that if the petitioner's confession were allowed into evidence, the case would be very difficult to defend on guilt, which would leave "just the penalty phase of the case." *Id.* Fannin concurred that preparing a closing argument on the penalty phase of the case was as important as the guilt phase, and that as a general

principle, making a closing argument is a good idea to accentuate the significance of witnesses called to testify in behalf of a defendant. *Id.* at 48–49.

Fannin also testified that he prepared for the case, and believed the witnesses who testified in the petitioner's behalf at the penalty phase presented evidence which was "generally favorable." *Id.* at 50. However, he waived closing argument because he wanted to "cut Mr. Rumsey off at the pass ... [a]nd that was part of the strategy to keep [Rumsey] from inflaming the minds of the jury. *That was the reason in that particular case why I didn't argue the penalty phase.*" *Id.* at 51. (Emphasis added)

Fannin testified that he had done research and concluded the rules of evidence in Alabama prevented the prosecution from completing a closing argument if the defendant waived his closing argument. *Id.* Fannin agreed that there was a reference in his file to the *Sheppard* case, and that he had relied upon said case to draw his conclusion that if he rested without arguing, the prosecution would be precluded from presenting further argument. *Id.* at 51–52. Actually, the Alabama Supreme Court in *Sheppard v. State,* 172 Ala. 363, 55 So. 514, 515 (1991) ruled that preclusion of further prosecutorial argument was within the trial court's discretion. In any event, during the colloquy concerning the objection at the Rule 32 hearing, Fannin conceded that he offered no case law to the trial court to support this conclusion. *Id.* at 52. Fannin also admitted that he remained petitioner's counsel on direct appeal, and presented a 1991 rule in support of his contention that the trial court erred in allowing the District Attorney to complete his closing argument. *Id.* at 53. However, Fannin could not recollect that the State had responded by asserting at the time of the 1989 trial, there existed three (3) Alabama Supreme Court cases

which declared that it was a trial judge's discretionary decision to allow or disallow a final prosecutorial argument after the defendant waived closing argument. *Id.* at 54.

The Alabama Court of Criminal Appeals reviewed the facts as set out above and concluded that Fannin was not ineffective. Their reasoning is as follows:

Lawhorn also asserts that trial counsel failed to research pertinent law ... [concerning] whether the district attorney could make a closing argument if the defense waived its closing argument. Fannin testified that he found a case before trial that supported his position that the district attorney could not argue if the defense waived its closing argument. Lawhorn contends that there were cases to the contrary which trial counsel should have found.

Trial counsel were not ineffective because they did not find the case the district attorney argued to the trial court. Trial counsel found a case which supported their position and presented it to the trial court. The fact that this Court ruled against counsel does not make them ineffective. Trial counsel's strategy was reasonable and trial counsel had case law to support their position, therefore, there was no deficient performance.

Further, Lawhorn was not prejudiced by his attorneys reliance on their understanding of the law concerning closing argument. Trial counsel's failure to make a closing argument did not cause him to be sentenced to death. There is no reasonable probability that, but for trial counsel's failure to do more research on waiving closing argument, that Lawhorn would not have been sentenced to death."

*Lawhorn v. Alabama,* (R. 28–29).

▮ The state court's action is the product of an unreasonable application of

the *Strickland* standard. Specifically, in its analysis to determine whether Fannin's legal performance was objectively deficient, the state court asserts that Fannin found a case which supported his position. There are two things wrong with this assertion. First, Fannin presented no case law to the trial court nor did he even mention that he was aware of a case to the court during colloquy. Second, Fannin agreed at the Rule 32 hearing that his personal file contained a reference to the *Sheppard* case and it was the case that caused him to waive his closing argument in order to prevent Mr. Rumsey's closing argument. In fact, the *Sheppard* case stands for the proposition that the trial court's decision to preclude the prosecution from completing its closing argument is discretionary, a far cry from mandatory. The distinction between such terms and their legal implications are clearly understood by any first year law student, much less an attorney who had been practicing approximately 25 years. Accordingly, the record clearly belies the state court's postulation that Fannin relied on a supportive case or presented same to the trial court. Trial counsel's interpretation of *Sheppard*, if indeed he made one, is wrong, and so obviously and egregiously so that it is preposterous for the learned state court to assert that same could possibly support Fannin's supposed strategy. Trial counsel's performance in this area was objectively deficient.

This court recognizes that the Supreme Court has found that the failure to present a closing argument during the sentencing phase does not necessarily constitute ineffective assistance of counsel. In *Bell v. Cone*, 535 U.S. 685, 122 S.Ct. 1843, 1848, 152 L.Ed.2d 914 (2002), defense counsel waived closing argument in order to prevent the district attorney from presenting further testimony. However, in *that* case the particular tactic worked, and an "extremely effective" district attorney was not allowed to complete his closing argument. *Id.* This, coupled with the fact that counsel made an opening statement in which he brought the mitigating evidence previously presented [23] to the jury's attention, asked the jury to spare his client's life [24], and the junior prosecutor presented a very "matter of fact closing that did not dwell on any of the brutal aspects of the crime," led the Supreme Court to determine that trial counsel was not ineffective for failing to make a closing argument. *Id.* at 1848, 1854.

Unlike the trial counsel in *Bell*, Fannin's opening argument consisted of naming four mitigating factors (age, lack of violent criminal history, acting under extreme duress or emotional disturbance, and background/character) he felt his evidence would show, telling the jury they were open to consider anything presented by the defendant as a mitigating circumstance, and finally stating, "I believe you'll hear sufficient evidence on the behalf of the Defendant, that you'll come back with a recommendation of life without parole, and that's what we're asking you to do at

**23.** This evidence consisted of expert testimony at trial that the defendant was insane at the time of the crimes, that he had a long history of consuming " 'rather horrific' quantities" of drugs causing chronic amphetamine psychosis, hallucinations and ongoing paranoia, that he felt remorse for the crimes, that he was an honorably discharged Vietnam veteran suffering from post-traumatic stress disorder, his mother's testimony that he returned from Vi-

etnam a changed person, that his father and fiancee died while he was in prison, and that he graduated from college with honor.

**24.** "Counsel urged the jury that there was a good reason for preserving his client's life if one looked at 'the whole man.' .... He asked for mercy, calling it a blessing that would raise them above the State to the level of God."

this point. Thank you very much." (R. 497–501).

In short, counsel's antiseptic opening failed to set forth any proposed facts in a manner that summarized the defendant's position and humanized the defendant. Moreover, counsel never asked the jury for mercy or to spare his client's life. Such an opening is objectionable when counsel knew that he was not going to present a closing argument. This, combined with his failure to present a closing argument, substantially prejudiced Lawhorn.

The state courts' determination that there exists no reasonable probability that petitioner was prejudiced when his counsel failed to make a closing argument is an unreasonable application of the *Strickland* standard under the circumstances. According to the Eleventh Circuit, "As long as 'the result of the proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results,' our confidence is undermined. Phrased another way, '[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.'" *Brownlee v. Haley,* 306 F.3d 1043, 1069, citing *Strickland,* 466 U.S. at 693–694, 104 S.Ct. 2052.

Trial counsel's failure to make a closing argument has rendered the jury's recommendation unreliable, especially in light of the fact that this ill-advised idea did not work, resulting in two closing arguments by the State and none by the defendant. Further, counsel presented no evidence nor did he request the trial judge to spare his client's life at the sentencing hearing. Therefore, Lawhorn's petition for writ of habeas corpus is due to be granted in connection with this claim.

h. Failure to propose any jury instructions nor did he object to any jury instructions presented at trial or argue the unconstitutionality of same on appeal.

Petitioner's factual basis for this argument is based upon the trial court's instruction regarding the 'heinous, atrocious, or cruel' aggravating factor. While it is true that counsel was objectively deficient for failing to object to the trial court's deficient instruction, the petitioner has shown no prejudice because the state appellate court conducted a constitutionally sound review of the factor in connection with the facts of petitioner's action, and affirmed the trial court's ultimate decision. See *infra,* Sections *K.* and *L.* Petitioner has failed to present a ground for habeas relief with regard to this claim.

i. Failure to object to the manner that respondent was cross-examined by district attorney Rumsey.

■■■■ Lawhorn contends that trial counsel was ineffective because he "failed to object to questions during Petitioner's cross-examination about the decedent's alleged pleading for his life." (Document # 1, at 34). This argument is without merit. At the penalty phase of the trial, Lawhorn himself testified that the victim did not speak plainly and was hard to understand. (R., at 556). Lawhorn also admits that he heard Berry "holler" after Berry was shot the first time and was attempting to run away from the defendants. (*Id.* at 557). Therefore, a factual basis had been laid by the prosecutor to ask the petitioner whether the victim was begging for his life after he had been shot. Lawhorn's request for habeas relief with regard to this claim in due to be denied.

j. Failed to object or respond to errors in the pre-sentence investigation report.

Petitioner asserts that the pre-sentence report "was replete with unfairly prejudi-

cial and otherwise objectionable materi-
al[,]" and as his basis therefore, he points
to the following statements within the re-
port:

> "*Personal/Social History*
>
> Adjustment during adolescence ap-
> pears to have been relatively good
> .... It does not appear that there
> were any severe or traumatic events
> during adolescence which would have
> interfered with normal personality de-
> velopment. No one brought up any
> sort of incidents of learning disabili-
> ties or mental or emotional problems."

(Document # 1, at 34).

Respondents support the decision of the
Alabama Court of Criminal Appeals on
collateral appeal, and contend that peti-
tioner has not shown that he is entitled to
§ 2254(d) relief. The Alabama Court of
Criminal Appeals agreed with and relied
upon the trial court's order when review-
ing this claim, and cited the following find-
ings and opinion by the trial court:

> At the Rule 32 hearing, Fannin testi-
> fied that he received the pre-sentence
> report on the day before or the day of
> sentencing. Fannin read the report and
> discussed the report with Lawhorn.
> Fannin did not recall whether there was
> anything in the report that he did not
> agree with. Fannin testified that there
> was nothing in the personal/social histo-
> ry in the pre-sentence report that he
> disagreed with. Fannin pointed out that
> the basis of the probation officer's state-
> ment that 'adjustment during adoles-
> cence was normal' was from conversa-
> tions with Lawhorn's mother and sister.
>
> The evidence at the Rule 32 hearing
> revealed that counsel read and reviewed
> the pre-sentence report. Lawhorn's at-
> torneys presented no evidence at the
> Rule 32 hearing as to why counsel
> should have objected to this statement,
> especially where the statement was from
> conversations with Lawhorn's mother

and sister. Counsel's failure to object to
this statement in the pre-sentence inves-
tigation report does not render trial
counsel's performance deficient. Fur-
ther, Lawhorn presented no evidence at
the Rule 32 hearing of how objecting to
this statement would have affected the
outcome of the sentencing. Lawhorn
failed to prove prejudice."

*Lawhorn v. State,* 756 So.2d at 991.

■ This court has previous concluded
that consideration of the pre-sentence in-
vestigation report was not unduly prejudi-
cial to the petitioner for the reasons set
out in Section Q, *supra.* Moreover, the
Rule 32 trial court judge, which is the
same judge who presided at petitioner's
trial and sentencing hearing, wrote in the
Rule 32 opinion that trial counsel's objec-
tion would not have altered his decision to
sentence the petitioner to death. There-
fore, petitioner has failed to show that trial
counsel was objectively deficient for failing
to object to portions of the pre-sentence
investigation report, nor has he proven
that he was prejudiced by same.

### Post–Conviction Prejudice Analysis

The following post-conviction errors oc-
curred in Lawhorn's case: (1) improper
prosecutorial argument to the jury com-
paring their duty to that of a soldier at
war; (2) ineffective assistance of counsel
for failing to present the testimony of the
victim's wife; and (3) ineffective assistance
of counsel for failing to make a closing
argument. Each of these errors sufficient-
ly prejudiced Lawhorn to such an extent
that his penalty hearing and sentencing
hearing were fundamentally unfair in vio-
lation of his right to due process of law.
Moreover, the cumulative effect of these
errors coupled with other objective errors
and deficiencies, which singularly did not
rise to a constitutionally prejudice level,

mandates that Lawhorn's petition for writ of habeas corpus be granted.

## IV. *Constitutionality of Alabama's Death Penalty Statute*

Lawhorn contends that the United States Constitution mandates there be a meaningful distinction between those individuals who receive the death penalty and those who do not receive the death penalty. (Document # 1, at 37). He asserts that since 1975, Alabama has convicted more than 250 persons of capital crimes "and have had their convictions affirmed by the Alabama Supreme Court." *Id.*

However, Lawhorn asserts that only 17 persons have been executed in Alabama between 1987 to 1998, and that "[t]here is no meaningful distinction between the 17 who have been executed and the many other who have been sentenced to death and had their sentence affirmed by the Alabama Supreme Court." *Id.* Lawhorn argues, "Upon information and belief, the overwhelming majority of individuals currently on death row will never be electrocuted pursuant to the Alabama statutory scheme." *Id.*

Respondents contend that Lawhorn did not raise this claim at trial or on direct appeal. (Document # 13, at 89). Therefore, when Lawhorn raised this claim for the first time in his Rule 32 petition, the trial court properly found "that the claim was procedurally barred from its review." *Id.* at 90.

■ A review of the record shows that the respondents' argument is correct. Moreover, Lawhorn did not appeal the trial court's denial of this claim on collateral appeal. "[A]bsent proof of cause and prejudice, federal courts are prohibited from reviewing a claim procedurally defaulted under state law if the last court to review the claim states clearly and expressly that its judgment rests on a procedural bar, and the bar presents an independent and adequate state ground for denying relief." *Davis v. Angeles*, 2000 WL 284275, *4 (S.D.Ala.2000) (*citing Harris v. Reed*, 489 U.S. 255, 260–61, 263, 109 S.Ct. 1038, 1042–43, 103 L.Ed.2d 308 (1989)). Therefore, this Court is precluded from reviewing this claim.

## RECOMMENDATION AND NOTICE OF RIGHT TO OBJECT

Accordingly, for the reasons stated above, the magistrate judge RECOMMENDS that Lawhorn's petition for writ of habeas corpus be GRANTED as to both the finding of guilt and the imposition of the death penalty.

The parties may file specific written objections to this report and recommendation within thirty (30) days from the date it is filed in the office of the Clerk. Failure to file written objections to the proposed findings and recommendations contained in this report and recommendation within thirty (30) days from the date it is filed shall bar an aggrieved party from attacking the factual findings on appeal. Written objections shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection.

The Clerk is DIRECTED to serve a copy of this report and recommendation upon the counsel for the petitioner and counsel for the respondent.